**SIERRA CLUB, et al., Plaintiffs,**

v.

**Bruce BABBITT, et al., Defendants.**

No. Civ.A. 97–0691–CB–C.

United States District Court,
S.D. Alabama,
Southern Division.

Aug. 4, 1998.

Eric E. Huber, Orleans, LA, Katherine Anne Meyer, Meyer & Glitzenstein, Washington, DC, for Plaintiffs.

Patricia Nicole Beyer, U.S. Attorneys Office, Mobile AL, Kenneth E. Kellner, Dept. of Justice, Washington, DC, Robin Michael, Dept. of Justice Gen. Litigation Section, for Defendants.

## ORDER

BUTLER, Chief Judge.

This action commenced in April of 1997 in the United States District Court of the District of Columbia when the original plaintiff's[1] filed this action seeking declaratory injunctive relief regarding two incidental take permits ("ITP's") issued by the Fish & Wildlife Service ("FWS") for the construction of two separate high density housing complexes in habitat of the endangered Alabama Beach Mouse ("ABM"), alleging that the FWS violated numerous provisions of the Endangered Species Act ("ESA"), and failed to prepare an Environmental Impact Statement ("EIS") as required by the National Environmental Policy Act ("NEPA"). The case was transferred to this Court on June 26th, 1997 pursuant to 28 U.S.C. § 1404(a), and on August 6th of 1997, the parties stipulated that the plaintiff's motion for preliminary injunction would be treated as a motion for summary judgment and that the defendants would file their opposition thereto and cross motion for summary judgment. They have done this, and the Court heard oral argument on these motions on May 21, 1998, and the case is now ripe for ruling.

It is important at the outset to note that the original preliminary injunction sought to

---

1. Plaintiffs Fort Morgan Civic Association, Mickey Stephens, and the Biodiversity Legal Foundation filed a motion to dismiss and a motion to withdraw. Pursuant to this motion the Court ordered that the claims of the above-named plaintiffs be dismissed with prejudice. Thus, all of the plaintiffs in this action have since settled with the developers leaving only the Sierra Club as a plaintiff.

"halt the validity" of the two ITP's until the Court had an opportunity to issue a final resolution of plaintiff's claims, which claims sought to permanently enjoin the FWS from continuing to permit (the builders/developers) to construct their developments ... unless and until the FWS has fully complied with the requirements of the ESA, NEPA, and the APA (Administrative Procedures Act). As this litigation has been developing, however, so have the two projects, and the Sierra Club now takes the position (Sierra Club Brief in Opposition to Federal Defendant's Motion for Summary Judgment—Tab 47) that they are "not seeking an order absolutely prohibiting development", but rather they are asking this Court to "set aside or suspend" the ITP's until FWS can "revise its environmental analysis, permit conditions, and conservation plans to comport with the law ...". In addition, the defendants challenge the Sierra Club's standing to bring this suit under ESA (defendant's supplemental motion for summary judgment—Tab 56).

Dealing first with the defendant's claim that the Sierra Club had no standing to bring this suit, as this court previously stated in *Sierra Club v. U.S. Army Corps of Engineers,* 935 F.Supp. 1556, 1568 (S.D.Ala.1996), "[i]n order to possess standing to invoke the power of federal court, a plaintiff must satisfy the following three constitutional requirements:"

> "First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally-protected interest which is (a) concrete and particularized and (b) 'actual or imminent, not "conjectural" or "hypothetical." ' Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court.' Third, it must be 'likely', as opposed to merely 'speculative', that the injury will be 'redressed by a favorable decision.' " *Region 8 Forest Service Timber Purchasers Council v. Alcock,* 993 F.2d 800, 805 (11th Cir.1993) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

Because there appears to be no dispute that the plaintiffs are capable of satisfying the second and third constitutional requirements recited by the *Region 8* court, this analysis will focus on the nature and extent of the injury suffered by the plaintiffs. In *Lujan,* the Supreme Court elaborated on the injury in fact criterion by stating that "a plaintiff raising only a generally available grievance" who claims harm "to his and every citizen's interest" and who seeks relief that "no more directly and tangibly benefits him than it does the public at large" has not satisfied the injury in fact requirement. *See,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d at 372. Thus, a "plaintiff must show that the challenged conduct has caused or will imminently cause demonstrable particularized injury to him such that he will benefit personally in a tangible way from the court action." *Sierra Club v. U.S. Army Corps of Engineers,* 935 F.Supp. at 1569. "In order to show an injury in fact, a plaintiff need not make any showing as to the magnitude of the injury suffered, and may satisfy the requirement by merely establishing that an 'identifiable trifle' of an injury has been or will imminently be incurred as a result of the challenged conduct". *Id.; See United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1973). Therefore, "the critical distinction is between a person with a direct stake in the litigation and a person with a mere interest in a problem." *See Id.*

In the original complaint, the plaintiff organization characterizes itself and its members in the following fashion:

> Several Sierra Club members reside on, or own land on, the Fort Morgan Peninsula. Sierra Club members also routinely recreate on the Peninsula because of its serene atmosphere, rural character, lack of substantial development, and environmental beauty. Many members recreate in this area to observe and otherwise enjoy the local wildlife, including the Alabama Beach Mouse. In particular, members enjoy knowing that the ABM and its habitat are present in the state. (Complaint ¶ 9.)

Furthermore, plaintiffs also claimed the following in their original complaint:

> Sierra Club members believe that the defendants' actions in permitting the planned

developments on the Fort Morgan Peninsula will, both individually and cumulatively, decimate the ABM and substantially destroy the atmosphere and ambiance of the Peninsula, significantly undermining its desirability as a recreational area. Impacts to the ABM will include direct and indirect mortality, habitat loss, habitat fragmentation, and increased harassment of the ABM as a result of increased human use and presence in the area. (Complaint ¶ 10.)

■ To bolster their claims further, three individual members of the Sierra Club submitted affidavits to the court explaining how they are benefitted by the ABM and its critical habitat, and how they would be harmed by defendants' actions. Sierra Club member Margie Welch filed an affidavit in which she states that she has used and enjoyed the beaches, dunes and other lands in, around and adjacent to the Bon Secour National Wildlife Refuge and the Fort Morgan Peninsula as long as she can remember. She also states that she has made efforts to observe and enjoy the ABM, and she discusses how the ABM is important to the growth of sea oats on the dunes (the seeds are scattered by the mouse). Finally, she states that the sea oats add to her enjoyment of the beauty and serenity of the area and the loss of the ABM will diminish the dunes. In a second affidavit, Sierra Club member Tom Hodges states that he owns property on and resides on the Fort Morgan Peninsula in the vicinity of the projects at issue. He states that he walks and hikes in the area, and also makes efforts to observe and enjoy the endangered species. In addition, Mr. Hodges claims that the value of his property depends upon sea oats protecting it from erosion, and thus the loss of the ABM threatens his property. A third affidavit was filed by Sierra Club member Eric Huber, who describes hiking annually in the Bon Secour National Wildlife Refuge and on the beach near the projects at issue, looking for ABM, and how

their loss would diminish his enjoyment of the area. He relates how the loss of the ABM would diminish his enjoyment of the Bon Secour National Wildlife Refuge.

The allegations presented in the complaint and in the affidavits filed by individual members of the plaintiff organization are sufficient, as a matter of law, to satisfy the injury in fact requirement for standing. As this court stated in *Sierra Club v. U.S. Army Corps of Engineers*, "the case law is abundantly clear that a minimal showing of detriment is all that is required to establish an injury in fact." 935 F.Supp. at 1571; *See, e.g. Japan Whaling Association v. American Cetacean Society*, 478 U.S. 221, 231 n. 4, 106 S.Ct. 2860, 2866 n. 4, 92 L.Ed.2d 166 (holding that plaintiff whale watchers alleged sufficient injury in fact by asserting that their ability to engage in whale watching activities would be adversely affected by continued whale harvesting activities of the defendant). Accordingly, the Court hereby rejects the defendants' argument that the plaintiff has not sufficiently alleged an injury in fact in this case. Finally, because no other challenges have been raised by defendants, the Court further concludes that the plaintiff organization possesses the requisite standing to pursue this action in federal court.

■ Defendants next contend that the Sierra Club did not comply with the statutory notice requirement which is prerequisite to bringing a citizen's suit under ESA § 11(g). In *Bennett v. Spear*, the Supreme Court stated that regardless of whether the plaintiff satisfied the ESA statutory notice requirements, they may nevertheless bring any ESA claim pursuant to the APA and any NEPA claim. *See Bennett v. Spear*, 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). Therefore, the defendants' argument does not affect plaintiff's claims brought under NEPA, or any ESA claims which plaintiff is capable of demonstrating may be brought under the APA. *See Bennett*, 520 U.S. 154, 117 S.Ct. at 1167.[2]

2. In *Bennett*, the United States Supreme Court clearly stated that nothing in the ESA citizen suit provision precludes a party from seeking judicial review under the APA:

No one contends (and it would not be maintainable) that the causes of action against the Secretary set forth in the ESA's citizen suit provision are exclusive, supplanting those provided by the APA. The APA, by its terms, provides a right to judicial review of all "final agency action for which there is no other adequate remedy in a court" 5. U.S.C. § 704, and applies universally "except to the extent that— (1) statutes preclude judicial review; or (2)

Because this case involves a challenge to the final administrative action of the FWS in issuing the two ITPs in question, the appropriate standard of review is whether actions of the FWS were 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law,' as set forth in 5 U.S.C. § 706(2)(A). *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). Thus, this Court's review is limited to the two voluminous sets of Administrative Records. In reviewing the agency's action, the Court considers whether the agency acted within the scope of its legal authority, whether it has explained its decision, whether the facts on which it purports to rely have some basis in the record, and whether the agency considered the relevant factors. *Citizens to Preserve Overton v. Volpe*, 401 U.S. 402, 415–16, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971).

The Supreme Court has stated that summary judgment is a tool to isolate and dispose of claims or defenses which are either factually unsupported or which are based on undisputed facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323– 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Summary judgment is appropriate where there is no genuine issue of material fact in dispute and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). The test for whether there is a genuine issue over a material fact is two fold. First, the materiality of a fact is determined from the substantive law governing the claim, and only disputes over facts that might affect the outcome of the suit are relevant on summary judgment. *Id.* Second, any dispute over material fact must be "genuine", and a dispute is genuine if the

evidence is such that it could cause a reasonable jury to return a verdict for either party. *Id.*, 477 U.S. at 252, 106 S.Ct. at 2512. Finally, it is the non-moving party's burden to demonstrate that there is evidence to support each essential element of his claim. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

As previously stated, this matter originally came before the Court on preliminary injunction, however, the parties have agreed that the trial of the action on the merits be advanced and consolidated with the hearing of the application by the parties filing summary judgment motions seeking this Court's determination as to whether the Administrative Record is sufficient under the arbitrary and capricious standard to warrant the agency action at issue. Any discovery in this case pertaining to the present motions has been completed, and is now contained in the two sets of Administrative Records. As to all challenges raised by both parties, although the parties have differing interpretations regarding the facts, there is no genuine dispute as to what those facts are. Summary judgement is, therefore, appropriate at this time.

The Plaintiffs first contend that the ITPs and Habitat Conservation Plans ("HCPs")[3] for both projects are not in accordance with the law, and are therefore in violation of the Administrative Procedure Act (APA) 5 U.S.C. § 706(2). Plaintiffs argue that there is no reviewable basis in the Administrative Record for the court to determine whether the amount of mitigation funding will "minimize and mitigate" the harm to the ABM "to the maximum extent practicable" as required by ESA § 10(a)(2)(B)(ii). The defendants argue that the record is sufficient to establish a basis for judicial review, the amount of mitigation funding is adequate in light of the

agency action is committed to agency discretion by law," § 701(a). Nothing in the ESA's citizen suit provision expressly precludes review under the APA, nor do we detect anything in the statutory scheme suggesting a purpose to do so. 520 U.S. 154, 117 S.Ct. at 1167.

**3.** Section 10 of ESA provides a limited exception to the otherwise strict prohibition against the "take" of an endangered species for what are termed "incidental takes"—i.e. those that are "incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). Pursuant to section 10,

the FWS may issue a permit for the "incidental take" of some members of the species, if the applicant for the permit submits a "conservation plan" that will—as its name plainly connotes—help "conserve" the entire species by facilitating its survival and recovery. *Id.* In addition, the FWS must make certain "findings" before it may issue such a permit, including that the applicant "will, to the maximum extent practicable, minimize and mitigate the impacts of such taking," and that "the taking will not appreciably reduce the likelihood of the survival of the species in the wild." 16 U.S.C. § 1539(2)(B).

additional mitigation measures proposed, and that the FWS has discretion to determine on a case by case basis the level or amount of mitigation required.

■ "It is rudimentary administrative law that discretion as to the substance of the ultimate decision does not confer discretion to ignore the required procedures of decision making." *Bennett*, 520 U.S. 154, 117 S.Ct. at 1166; *See SEC v. Chenery Corp.*, 318 U.S. 80, 94–95, 63 S.Ct. 454, 462, 463, 87 L.Ed. 626 (1943). When an administrative agency fails to provide an adequate basis in the Administrative Record for its action, such action is arbitrary and capricious. *See e.g. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983); *Nat'l Nutritional Foods Ass'n v. Weinberger*, 512 F.2d 688, 701 (2nd Cir.) *cert. den.*, 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 44 (1975) (stating that, "even under the "arbitrary and capricious" standard agency action will not be upheld where inadequacy of explanation frustrates review"); and *AT & T v. FCC*, 974 F.2d 1351 (D.C.D.C.1992) (agency action will not be upheld where agency has failed to offer a reasoned explanation of the record). Thus, although under the "arbitrary and capricious" standard, a reviewing court may not set aside an agency action that is rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute, " ... the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' " *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43, 103 S.Ct. at 2866.

This Court has spent a considerable amount of time carefully reviewing the Administrative Record in order to ascertain whether the agency supplied a sufficient basis for the Court to determine whether the

ICPs and HCPs "minimize and mitigate" the projects' harm to the ABM "to the maximum extent practicable" as required by ESA § 10(a)(2)(B)(ii). In making this determination the Court must first look to the substantive law (ESA § 10(a)(2)(B)(ii)) to ascertain what is required of the agency, and then to the Administrative Record to determine whether the agency has complied with the law.

Against the ESA statutory framework and the FWS's regulations regarding Endangered Wildlife (50 C.F.R., § 17.21, et. seq.) it is unlawful to "take"[4] an endangered species without first obtaining, from the FWS, an ITP pursuant to ESA § 10(a)(1)(B). The ITP must include, among other things, "a conservation plan", and the steps the applicant will take to minimize and mitigate the impact to the species or its habitat. (50 C.F.R. § 17.22(b)(1)). The director of the FWS considers certain criteria and "shall issue" the permit if he finds that: "(i) the taking will be incidental; (ii) the applicant will, to the maximum extent practicable, minimize and mitigate the impact of such taking; (iii) the applicant will insure that adequate funding for the conservation plan ... will be provided; (iv) the taking will not appreciably reduce the likelihood of the survival ... of the species ..." (50 C.F.R. 17.22(b)(2)). It is criteria (ii) around which this dispute largely focuses: whether "to the maximum extent practicable" the developers' HCPs adequately minimize and mitigate the impacts likely to result from the proposed takings. Once an application for an ITP is submitted, the FWS must conduct a biological assessment (BA) in accordance with ESA § 7(b)(3)(4) (50 C.F.R. 402.14(h)–(i)) which must include a discussion of the effects of the action on the ABM and the FWS's opinion of whether the action is likely to jeopardize the continued existence of the ABM or result in the destruction or adverse modification of critical habitat. FWS has developed a handbook which guides

---

4. Once a species is listed as an endangered species, it is entitled to a panoply of additional protections under the ESA. The most important of these is the statutes's prohibition against the taking of an endangered species, pursuant to section 9. 16 U.S.C. § 1538(a). The term "take" is broadly defined to include "harass, harm, pursue, hunt, shoot, wound, kill, capture,

or collect." 16 U.S.C. § 1532(19). The FWS has further defined "harm" to include "significant habitat modification or degradation, where it actually kills or injures wildlife." 50 C.F.R. § 17.3—a definition which was recently upheld by the Supreme Court in *Babbitt v. Sweet Home Chapter*, 515 U.S. 687, 708, 115 S.Ct. 2407, 2418, 132 L.Ed.2d 597 (1995).

them through the statutory and regulatory maze involved in the permit process and requires early coordination between the regional office and the applicable field office. (*See Fort Morgan Paradise Joint Venture Administrative Record ("FM AR")*, Tab 84).

The ABM was listed as endangered in 1985, and at that time the FWS concluded that the species' habitat was being drastically destroyed "by residential and commercial development, recreational activity, and tropical storms". 50 Fed.Reg. 23872 (June 6, 1985). The FWS determined that on the portion of the Alabama coast known as the Fort Morgan Peninsula, there was in 1985 a total baseline habitat of approximately 671 acres of which approximately 402 are known as fore dunes, 269 scrub dunes. (FM AR Tab 3, Table 2 of BO). Between 1985, when the ABM was listed, and January 1996, when the FWS issued an ITP for construction of the first of the two developments at issue in this case—the 52 acre Aronov project—another 8.5% of dwindling ABM habitat was lost due to additional commercial development and damage from Hurricane Opal. (Aronov AR Tab 10, p. 17). Indeed, during that time, the FWS issued four other ITPs allowing further habitat loss in the area, including two permits for the construction of single family residences and two permits for the construction of an additional 110, multi-family residential development—the 64–lot "Laguna Key" development, and the 60–unit "Kiva Dunes" residential community and golf course. (Aronov AR Tab 10, p. 17–20). According to the FWS, the four ITPS issued prior to Aronov resulted in the destruction of a total of 41.3 acres of ABM habitat. (FM AR Tab 3, Table 3). The remaining ABM habitat has also been reduced by a series of hurricanes, and in January 1996 the FWS concluded that the "designated critical habitat may be an inadequate area for ABM recovery and delisting". (Aronov AR Tab 10, p. 11). In the final biological opinion, the FWS noted that the net direct effect of the Fort Morgan project will be the permanent destruction of 37 acres of currently occupied ABM habitat, of which 25 are scrub dunes habitat and an undetermined number of ABM will be incidentally taken during destruction. The FWS also determined that as to the Aronov Project the net direct effect

will be the permanent destruction of 7.5 acres currently occupied by ABM, 6.5 of which is scrub dune habitat, and an undetermined number of ABM incidentally taken during construction. (Aronov AR Tab 10). During the internal coordinating process among the FWS and its regional field office in Jackson, Mississippi, the field office received a draft of the BO (FM AR Tab 3) for the Fort Morgan project and concurred that the ITP "will not jeopardize the ABM or adversely modify its critical habitat ...", but goes further and states its "primary concern" is over the "level of mitigation provided" (FM AR Tab 13), or "whether the mitigation has been to the maximum extent practicable". The field office also received a draft of the BO (Aronov AR Tab 10) for the Aronov project and concurred that the ITP should be issued. (Aronov AR Tab 2).

■ The primary bone of contention in this lawsuit evolves around the proposals in the HCPs incorporated into the Aronov Realty Management, Inc. ITP at paragraph H(5) that there be $60,000 collected from the developer for offsite, mitigation "to acquire property of quantity and quality sufficient to compensate for and minimize unavoidable impacts of the project area", and incorporated in the Fort Morgan ITP at paragraph G(5) that there be $150,000 collected from the developer for offsite mitigation. The plaintiffs first contend that the level of off site mitigation funding is inadequate, and cannot be supported by any rational basis in the Administrative Record. In addition, the plaintiffs challenge the inconsistent application of the FWS's off site mitigation policies. Finally, the Plaintiffs contend that the FWS's reliance on speculative unnamed sources to contribute additional funds in order to make up for the inadequacy of the amounts of off site mitigation funding the FWS required the developers to pay is arbitrary and capricious, and otherwise not in accordance with the law.

First, the plaintiffs maintain that the level of mitigation funding for both projects is inadequate, and that the agency's determination of these amounts is arbitrary and capricious. The lack of any analysis in the Administrative Record concerning whether the

amount or level of offsite mitigation funding is to the maximum extent practicable supports the plaintiff's contention. Moreover, the Jackson field office supervisor voiced much concern over the inadequacy of the level of funding for offsite mitigation required by the HCP for the Fort Morgan project: "Overall, our primary concern is the amount or level of mitigation provided". (FM AR Table 13). The field office based these concerns on consideration of the biological effects of the project and a comparison of such effects to the level of mitigation provided by other ITPs with high density real estate development. Based on these considerations the field office stated that, "we believe the amount of mitigation provided is low". Moreover, the field office noted that, "the biological effects of the Joint Venture project are the single most largest (sic) of any ABM HCP to date", and "the project provides the least mitigation for the effects of high density. development of any previous ABM HCP or ITP". (FM AR Tab 13). Furthermore, although the field office failed to voice similar concerns over the Aronov project's HCP and ITP, the record nevertheless shows that the FWS failed to support the level or amount of offsite mitigation funding with a clearly articulated analysis demonstrating whether the amount or level of funding is rationally based on the relevant facts. The defendants claim that the field office's concerns were addressed prior to the final draft of the BO when the field office was informed that the "ITP would state our use of these additional funds" (i.e. annual assessment fees) for offsite mitigation in addition to the $150,000. (FM AR Tab 8). However, such a conclusory statement does little to ameliorate the lack of a sufficient basis upon which the FWS can demonstrate that the mitigation measures are to the maximum extent practicable. Furthermore, the statement that the defendants refer to merely establishes that some of the funding which the HCP previously allotted for on-site mitigation measures may now be shifted to make up for the inadequacy of the offsite mitigation funding. However, this in no way in-

creases the mitigation measures, nor does it provide the necessary analysis to demonstrate that the existing level of mitigation is sufficient. Remarkably, the FWS simply ignored the clearly expressed concerns of the experts Congress intended the agency to rely upon in making such discretionary decisions. This is further illustrated by the complete lack of subsequent consideration or explanation of the amount of mitigation funding in the final BO, HCP, and ITP. As the Court finds that there is no sufficient basis in the Administrative Record to support the amount of offsite mitigation funding, the issuance of the ITPs was arbitrary and capricious.

In addition, the plaintiffs contend that the inconsistency in the amounts of offsite mitigation funding that the FWS has required for various high density developments on the Alabama coast[5] indicates that the FWS has failed to develop an appropriate standard for determining what levels of mitigation will mitigate the effects of these two projects to the maximum extent practicable. The FWS's Habitat Conservation Planning Handbook (FM AR Tab 84) is intended to guide the agency through complex determinations such as the establishment of mitigation measures for HCP. The Handbook states that "[m]itigation measures required by individual FWS or NMFS offices should be as consistent as possible for the same species", and that consistency is "essential". (FM AR Tab 84). The Handbook goes on further and states that consistency is to be accomplished by (1) establishing good communication between offices, and (2) establishing "specific standards". Moreover, *"[t]he Service should not apply inconsistent mitigation policies for the same species, unless differences are based on biological or other good reasons and are clearly explained."* (FM AR Tab 84) (emphasis original). The Court can find no evidence that the FWS paid any attention to its own guidelines. The Court searched the Administrative Record thoroughly in search of any

---

**5.** The following identifies the projects since 1985 on the Alabama Coast for which an ITP was issued, the number of acres of ABM the project destroyed, and the amount of off site mitigation funding the FWS required: (Laguna Key/ 19 / None), (Kiva Dunes/ 14 / None), (Phoenix/ 1.4 / $80 K), (Sage / 7 / $50 K), (Aronov / 7.5 /$60 K), (Fort Morgan / 37 /$150 K). (FM AR Tab 3, Table 3).

evidence that the FWS applied its own internal guidelines, but finds that first of all the FWS never explained or provided any analysis of whether the amount of offsite mitigation required is "to the maximum extent practicable". In addition, despite the explicit directive in the FWS Handbook not to apply inconsistent mitigation policies and to provide good reasons for or to explain clearly any inconsistent applications, the agency never provided "good reasons" for or "clearly explained" why the FWS applied inconsistent mitigation policies for the ABM in the same geographic area. Moreover, the FWS's complete disregard of the experts, who cautioned the agency that the level of mitigation was not to the maximum extent practicable, only serves to amplify the arbitrariness of the FWS's decision that such levels of offsite mitigation were in compliance with the law. Although neither Congress nor the FWS Handbook requires the FWS to develop one specific formula for determining the level of mitigation required for all projects, the Administrative Record must contain some analysis of why the level or amount selected is appropriate for the particular project at issue, and the FWS should not apply inconsistent mitigation policies for the same species in the same geographic area, unless differences are based on biological or other good reasons and are clearly explained. The Court finds on the basis of the record for these two projects that the agency's inconsistent application of offsite mitigation measures for the same species in the same geographic area is arbitrary and capricious, as the record is devoid of any "biological or other good reasons to justify such findings".

Finally, the FWS's speculative reliance on other unnamed sources to contribute funds to make up for the inadequacy of the amounts of offsite mitigation funding required is simply contrary to the law and unsupported by any factually reliable basis in the Administrative Record. In the Biological Opinions the FWS states that the Applicant's offsite mitigation funding would have to be combined with additional funds from a non-profit organization in order to purchase a large tract or several tracts for mitigation purposes. The BO does not establish how much those funds would be, who they would come from, or whether it is likely they could be acquired. Nevertheless, the FWS issued the two ITPs at issue by relying on funding from an unknown source for an unknown amount, and accepts that his will "minimize and mitigate" the effects of the projects to the maximum extent practicable. Because the Administrative Record does not establish what level of funding has been offered by "other sources", the FWS cannot demonstrate any basis in the Administrative Record upon which the level or amount of offsite mitigation measures are "to the maximum extent practicable". Moreover, the law establishes that the FWS cannot comply with the strict ESA mandate that the HCP "minimize and mitigate" the effects of the projects to the "maximum extent practicable" simply by relying on speculative future actions by others. Cf. *Sierra Club v. Marsh*, 816 F.2d 1376 (9th Cir.1987) (action agency cannot "insure" project will not jeopardize species based on promise of future mitigation measures); *NWF v. Coleman*, 529 F.2d 359 (5th Cir. 1976). *cert. denied*, 429 U.S. 979, 97 S.Ct. 489, 50 L.Ed.2d 587 (proposed actions by others does not "insure" that agency's actions will not cause jeopardy); *Southwest Center for Biological Diversity v. Babbitt*, 939 F.Supp. 49 (D.D.C.1996) (FWS's reliance on future actions by Forest Service does not comport with the language of statute that FWS base its listing decisions on "existing" regulatory mechanisms).

Based upon all of the above considerations, the Court finds that the Administrative Record is devoid of any rational basis upon which the FWS could have reasonably relied in deciding to issue the ITPs for these two projects. Therefore, because the Court finds that the permits at issue fall short of both the ESA and APA standards, they must be remanded to the agency for review and reissuance.

The plaintiff next contends that the FWS issued a "finding of no significant impact" ("FONSI"), and failed to prepare an environmental impact statement ("EIS") as required under NEPA. Federal agencies are required under NEPA to consider the environmental consequences of proposed actions to ensure "fully informed and well considered" deci-

sions. *Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 228, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980) (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)). Thus, NEPA requires that federal agencies "shall" prepare an EIS on all major federal actions that "significantly affect" the environment. 42 U.S.C. § 4332(C). Pursuant to Council on Environmental Quality ("CEQ") implementing regulations, in determining whether an action may "significantly" affect the environment—and thereby require an EIS—the agency must consider the following factors: (1) the unique characteristics of the geographic area such as proximity to . . . ecologically critical areas; (2) the degree to which the environmental effects of the proposed actions are highly controversial; (3) the degree to which the action may adversely affect an endangered or threatened species or its critical habitat; and (4) the cumulative impacts of its action. 40 C .F.R. § 1508.27. The CEQ—an agency established by NEPA—has promulgated implementing regulations that are binding on all federal agencies. *Andrus v. Sierra Club,* 442 U.S. 347, 351 n. 3, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979). The CEQ regulations direct federal agencies to prepare an environmental assessment ("EA") in order to determine whether the environmental effects of a proposed project are "significant". 40 C.F.R. §§ 1501.3, 1501.4, 1508.9, 1508.27 (1998). Under these regulations, the purpose of an EA is to "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a)(1) (1998). Thus, an agency will reach one of two conclusions in an EA: "either that the project requires the preparation of an EIS to detail its environmental impact, or that the project will have no significant impact . . . necessitating no further study of the environmental consequences which would primarily be explored through an EIS." *Sabine River Auth. v. United States Dep't of Interior,* 951 F.2d 669, 677 (5th Cir.1992).

■ In reviewing an agency's decision not to prepare an EIS, courts must "ensure that the agency has taken a 'hard look' at environ-

mental consequences" of its action. *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). While a review of agency action is narrow and presumes the agency action valid, *Ethyl Corp. v. EPA,* 541 F.2d 1, 34 (D.C.Cir.), *cert. denied.,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976), an agency action shall be set aside as arbitrary and capricious where the agency has "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfr. Ass'n.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). There are four criteria to be considered in determining whether an agency's decision not to prepare an EIS is arbitrary and capricious:

> First, the agency must have accurately identified the relevant environmental concern. Second, once the agency has identified the problem it must have taken a "hard look" at the problem in preparing the EA. Third, if a finding of no significant impact is made, the agency must be able to make a convincing case for its finding. Last, if the agency does find an impact of true significance, preparation of an EIS can be avoided only if the agency finds that changes or safeguards in the project sufficiently reduce the impact to a minimum.

*Hill v. Boy,* 144 F.3d 1446 (11th Cir.1998) (Quoting *Coalition on Sensible Transp., Inc. v. Dole,* 826 F.2d 60, 66–67 (D.C.Cir.1987)).

■ After a careful review of the Administrative Record, the Court is persuaded that many of the important "facts" on which the FWS based its decision appear to be assumptions, presumptions, or conclusions themselves—not facts based on any evidence, documents, or data in the Administrative Record. First, the FWS lacks a reasonably accurate, current estimation of the total number of ABM remaining throughout the ABM's dwindling range. According to the Aronov BO, in 1994 the speculation as to the total number of ABM ranged from 45 to 1,000, and the FWS now concedes that "accurate ABM density estimates are not avail-

able." (Aronov AR Tab 1(BO), p. 8). Furthermore, in a report concerning the Fort Morgan project, a FWS biologist states that "ABM population density estimates are not available", and thus, "the number of ABM conserved or incidentally taken as a result of HCPs cannot be directly estimated." (FM AR Vol. 2, Tab 57). Moreover, the "reliable range wide estimates of ABM population size and density are not available." (FM AR Tab 3, p. 5 and p. 11). The record clearly establishes that the FWS's determination of no significant impact is based on insufficient, inaccurate, old and out of date data. As the FWS field office supervisor noted, before and after data, or trend data, would be necessary to compare the historical baseline data if there were to be a reasonable conclusion reached on the extent of harm occurring to the ABM. Specifically, the FWS supervisor states the following:

> With continued habitat loss, the Service must denote the net loss to the historical baseline. Limiting the conclusions of biological effects to the current baseline is neither adequate or sufficiently accurate for the Service to closely assess the incremental loss of ABM habitat. (FM AR Tab 13, p. 11).

The FWS supervisor's conclusion is further supported in the Administrative Record by the following statement by Dr. Nicholas Holler:

> The extent of these impacts cannot be evaluated without additional information on the status of habitat to the east and west of the project, and the size of the contiguous habitat block that presently supports the beach mouse population. The relationship of this population to other beach mouse populations must also be considered. (FM AR Tab 67, p. 1).

Moreover, although the FWS has determined the range of the ABM, the Administrative Record lacks any data showing how the ABM are distributed within that range. The FWS field officer noted that: "In the absence of data comparing the relationships between residential density and ABM relative abundance, the Service does not exactly know the density and related conditions when ABM can no longer persist in a residential matrix." (FM AR Tab 13, p. 8). The finding of no significant impact is made without any inventory or population data regarding how many of this declining endangered species exist elsewhere in the range, and without knowing how many of the species are being destroyed in the project sites. Thus, there are no current or past population data trends to evaluate in the Administrative Record or to support the FWS's FONSIs. Moreover, the Administrative Record has no information on the minimal viable population of the ABM. This is clearly stated in the Fort Morgan project's EA: "The size of a minimally viable population has not been estimated because of inadequate demographic and other data." (FM AR Tab 3, p. 12). Without knowing the minimum viable population the FWS cannot reasonably estimate the extent of the impact the additional takings will pose, and thus, without this data the FWS cannot reasonably state that the projects will not have a significant impact.

While it is unclear to the Court on what basis the findings of no significant impact were made, it is clear on what basis they were not. They are not made on the basis of population inventories in the project area. They are not made on the basis of population trend data for the species throughout its range. They are not made on the basis of any minimal viable population data. Therefore, the FWS's findings of no significant impact are based only on the FWS's assumption that these projects will not kill or take a large enough number of reproductive members of the population to effect viability, and such findings are not supported by any fact or analysis in the Administrative Record. Because the agency failed to consider important aspects of the problem and relied on insufficient, inadequate, and, out of date data, it was arbitrary and capricious for the FWS to issue findings of no significant impact, and thus, in their action violated NEPA. As the Court concludes that the record does not support the FWS's findings of no significant impact or the decisions not to prepare EISs, the Court holds that a remand is necessary. On remand, the FWS must gather the necessary scientific data and conduct the required scientific analysis in order to determine whether the issuance of the ITPs will have a significant impact on the ABM or its critical

habitat and thereby require the preparation of an EIS for either or both projects.

Accordingly, the plaintiff's motion for preliminary injunction (treated by the stipulation as a motion for summary judgment) is **GRANTED,** and the defendant's cross ·motion for summary judgment is **DENIED.**

The Court remands to the Fish and Wildlife Service the decision to issue the two ITPs for review in accordance with the findings of this Order, and if the ITPs are to be issued, for consideration of whether the issuance of the permits would have a significant impact on the quality of the environment.

It is so **ORDERED.**