SIERRA CLUB and Friends of the Earth, Inc., Plaintiffs,

v.

Gale A. NORTON, Secretary, Department of the Interior, et al. Defendants,

and

Fort Morgan Paradise Joint Venture, et al., Defendants/Intervenors.

No. CIV.A. 02–258CBC.

United States District Court, S.D. Alabama, Southern Division.

June 19, 2002.

Carrie Esther Boykin, Nathalie M. Walker, Mary Jane Mace, New Orleans, LA, Daniel A. Hannan, Franklin & Stein, P.C., Mobile, AL, for plaintiffs.

Patricia Nicole Beyer, U.S. Attorney's Office, Mobile, AL, Barclay T. Samford, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, DC, for Gale A. Norton, Fish & Wildlife Service, defendants.

Sid J. Trant, Andrew Robert Greene, Bradley Arant Rose & White, LLP, Birmingham, AL, David A. Bagwell, Fairhope, AL, Murray Dov Feldman, Holland & Hart, LLP, Boise, ID, for Fort Morgan Paradise Joint Venture, defendant.

Caine O'Rear, III, Hand Arendall, L.L.C., Mobile, AL, Edwin S. Schwartz,

Tucker, GA, Richard A. Horder, Kilpatrick Stockton, LLP, Atlanta, GA, for Gulf Highlands, LLC, defendant.

## ORDER

BUTLER, Chief Judge.

### I. Introduction

This action again brings before this court a contest between real estate development along the coast of Baldwin County, Alabama, and preservation of a federally-protected endangered species, *Peromyscus polionatus ammobates*, commonly known as the Alabama Beach Mouse. In its current procedural posture, the case presents a narrow issue (which in the nature of such matters is replete with acronyms): whether plaintiffs are entitled to a preliminary injunction in relation to their claim that the United States Fish and Wildlife Service ("FWS") violated the National Environmental Policy Act ("NEPA") in granting two Incidental Take Permits [1] ("ITPs") to developers without requiring preparation of an Environmental Impact Statement ("EIS").

The ITPs at issue involve 196.5 acres of the remaining beach mouse habitat, and allow two developers to take (harm or kill) beach mice both during construction of several high-rise condominium towers and other structures on Fort Morgan Peninsula, Baldwin County, Alabama, and through the degradation and/or destruction of its habitat. These projects and the permits are discussed in more detail below.

Plaintiffs bring this action pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq.*, and

---

**1.** Section 9 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1538(a), makes it an offense to "take" a species designated as "threatened" or "endangered". The term "take" is defined broadly, and making it illegal to "harass, harm, pursue, shoot, wound, kill, trap, capture, or collect" a member of the threatened or endangered species. 16 U.S.C.

§ 1532(19). The regulations of the FWS define "harm" to include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering." 50 C.F.R. § 17.3.

the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551, *et seq.*[2] Plaintiffs seek a preliminary injunction prohibiting the "take" of any ABM and the destruction of any of its habitat by Gulf Highlands LLC and Fort Morgan Paradise Joint Venture ("Developers" or "Intervenors") in reliance on the ITPs issued for the proposed developments on Fort Morgan Peninsula in Baldwin County, Alabama.

On April 30, 2002, the Court held a hearing on the plaintiffs' Motion for Preliminary Injunction. All parties, including intervenors, were represented. The government and the intervenors presented selected documents which formed part of the administrative record.[3] The government also offered live testimony of two witnesses, David Flemming, an ecological services supervisor in the Atlanta Regional Office of the FWS, and Will McDearman. Mr. Flemming supervised the ITP review in this case. Mr. McDearman was involved with preparation of the ITP analysis for two prior ITPs which this court overturned in *Sierra Club v. Babbitt.* Since 1998, he has been working as a biologist for the FWS field office in Jackson, Mississippi, and thus had no role in addressing the two current ITPs. In addition, each of the developers submitted affidavits addressing the amount of economic harm should the court grant a preliminary injunction, the value in monetary terms of the land set aside as a "preserve" for the beach mouse under the HCP, and other matters.

■ The court has been previously called upon to wade into similar conflicts over the Alabama Beach Mouse. In one such recent case, *Sierra Club v. Babbitt,* 15 F.Supp.2d 1274 (S.D.Ala.1998), this court remanded two other ITPs which had been issued by the FWS for development projects on the Fort Morgan Peninsula in Baldwin County.[4] The court held that the lack of current, reliable population data, lack of data on distribution of the Alabama Beach Mouse within its range, and lack of an estimate of the minimum viable population size rendered the FONSI arbitrary and capricious, in the absence of any basis for determining how the proposed action would affect the ability of the Alabama Beach Mouse to survive or recover.[5]

In the instant case, the FWS has again issued two ITPs for development on 196.5

**2.** The action was filed on April 18, 2002. The Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544 (1994), requires that a private litigant provide the agency with sixty (60) days written notice before filing suit under its provisions. 16 U.S.C. § 1540(g)(2)(A)(i). However, the FWS provided only ten (10) days publication notice of its intent to grant the ITPs. Plaintiffs thus seek preliminary injunctive relief under the provisions of NEPA and the APA. See *Bennett v. Spear,* 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). From comments made, it appears that plaintiffs may intend to amend their complaint to add a claim under the ESA in time for consideration on the merits, or may bring such a claim in a separate action.

**3.** On June 4, 2002, the FWS filed the complete administrative record, though certain portions of the record have been withheld subject to a claim of privilege. In deciding the plaintiffs' Preliminary Injunction Motion, the court considers only the record excerpts previously presented, as these formed the basis for the briefs and arguments of counsel. No party has identified any portion of the complete record which they deem crucial to the instant Motion. The delay in requiring rebriefing by the parties and in the court ruling on the claims of privilege and thereafter familiarizing itself with the complete 12–volume record would allow further destruction of the beach mouse and its habitat, as well as further investment by the developers, and thus undermine the purpose of the injunction.

**4.** Following the court's remand, the developments were allowed to go forward, due in part to a settlement with plaintiffs.

**5.** The ESA provides for protection of the remaining members of endangered species and

acres of privately owned land on the Fort Morgan Peninsula of Baldwin County. The agency asserts that it has avoided the failings previously found by this court.[6] The FWS does not now claim to have sufficient additional data on total population and population density and distribution within the range to allow a determination of the effect of the developments on beach mouse viability; the agency has not determined the minimum population needed for the continued viability and recovery of the species.

Instead, the agency asserts that it can approve the permits based primarily upon a habitat-based analysis. However, the record does not demonstrate that the agency has any clearer idea what effect the project will have on the beach mouse

under this approach than it did under the incomplete population-based approach previously criticized by the court. Indeed, the Environmental Assessment issued by the FWS acknowledges that, under its habitat-based analysis, the agency still does not know what effect the loss of optimal habitat is likely to have on the species. Tab 7(EA) §§ 4.4.4, 5.1.1. Nor has the Service cogently identified, under its habitat-based analysis, the minimum habitat requirements for the continued survival-let alone recovery-of the species. It thus has not considered such minimum requirements in connection in the decision that the ITPs at issue would not cause a "significant" impact on the environment, so as to require more detailed analysis of the decision through preparation of an Environmental Impact Statement.[7]

their designated critical habitat, and also provides for efforts toward their eventual recovery. 16 U.S.C. §§ 1533(f)(1)(B)(i). "The sweep of NEPA is extraordinarily broad, compelling consideration of any and all types of environmental impact of federal action." *Environmental Defense Fund, Inc. v. Massey*, 986 F.2d 528, 536 (D.C.Cir.1993)(quoting *Calvert Cliffs' Coordinating Committee, Inc. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1122 (D.C.Cir.1971)). NEPA requires consideration of all effects on the environment, and is not limited to consideration of the effects on endangered species.

6. The Joint Submission by Defendant and Intervenors contains documents relevant to that prior remand; it is not clear whether they are properly part of the administrative record in the instant action or what role they may have played in the agency's determination.

7. Such a determination is not a necessary or even a relevant consideration to every determination of environmental impact. The court finds a determination of minimum population or habitat is likely to be relevant in this case because extinction of the species is a legitimate concern, in light of the following:

a) the declaration of Martha J. Groom, Ph. D., submitted to the FWS, which expressly raises the issue of the possibility of extinction

due to habitat losses to date and the ITPs at issue;

b) the endangered status of the species most affected by the ITPs;

c) the findings published in 1985 concerning loss of habitat, particularly losses due to development, as the primary cause of the species becoming endangered;

d) the limited size of the remaining habitat (both in absolute terms and relative to the species' historical range) and the relative size of the anticipated habitat losses resulting from the ITPs at issue as well as the cumulative impact of the 17 other ITPs issued since 1985; and

e) the lack of sufficient evidence to determine the current population of the species and its distribution within its remaining range, particularly within the project area.

In the absence of such information, the record offers insufficient support for a conclusion that-despite the large absolute and relative loss of habitat-the impact of the projects will so clearly be insignificant that there is no need for in-depth study through preparation of an EIS.

Further, though the FWS has funded a population viability study which is presently being conducted, the agency claims that such studies are unreliable in relation to this species. On that basis, it asserts that a habitat-based analysis is a sufficient alternative by

Despite this lack of data, the agency entered a finding that the proposed action would have no significant impact on the environment, including particularly the endangered Alabama Beach Mouse. As discussed below, the court finds that plaintiffs are likely to succeed on the merits of their claim that the FWS's Finding of No Significant Impact ("FONSI") in the absence of such data was arbitrary and capricious, that the threatened impact-as found by the FWS-to the ABM's habitat is significant, that such impact is more significant when considered in connection with the cumulative impact of other prior and reasonably foreseeable future losses, and that the issuance of the ITPs without completion of an EIS was thus improper. The court further finds that the plaintiffs are entitled to entry of a preliminary injunction.

## II. *Jurisdiction*

This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

### A. *Standing*

The court has previously held, in a closely analogous case brought by Sierra Club against the same governmental defendants [8] over incidental take permits for the Alabama Beach Mouse issued to developers on the Fort Morgan Peninsula, that Sierra Club has standing to bring such a claim. *Sierra Club v. Babbitt*, 15 F.Supp.2d 1274, 1276–77 (S.D.Ala.1998). Sierra Club makes similar allegations in

this action. The court adopts its former analysis, and determines that standing is no impediment to the court's exercise of jurisdiction.[9]

### B. *Reviewability:*

■ This action challenges a final agency action, the issuance by the Fish and Wildlife Service of an Incidental Take Permit for the endangered Alabama Beach Mouse without an Environmental Impact Statement, and thus presents a reviewable issue. See *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)(overruled on other grounds by *Califano v. Sanders*, 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192, (1977)); 5 U.S.C. § 701.

## III. *Standard of Review*

### A. *Preliminary Injunction:*

■ In deciding the plaintiffs' Motion for Preliminary Injunction, the court considers whether the evidence supports a finding in plaintiffs' favor on four elements: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction were not granted, (3) that the threatened injury to the plaintiff outweighs the harm an injunction may cause the defendant, and (4) that granting the injunction would not disserve the public interest." *Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir.1998).

---

which to determine the impact on the ABM. However, in the absence of information concerning the minimum habitat requirements for survival and recovery of the beach mouse, particularly in light of the threat of extirpation of localized populations due to weather events such as hurricanes, it is questionable whether the habitat analysis alone is sufficient to support a Finding of No Significant Impact.

**8.** Plaintiff filed suit against the heads of the same agencies in both actions; only the par-

ticular persons named as the heads of those agencies have changed.

**9.** As at least one of the plaintiffs has been determined to have standing, the court can exercise jurisdiction over the case and the instant Motion for Preliminary Injunction jointly filed by both plaintiffs. The court reserves ruling on whether the allegations made by plaintiff Friends of the Earth, Inc., are sufficient to confer standing. The parties may address that issue separately.

### 1. Review of the Merits

In reviewing the preliminary injunction claim, the court considers the likelihood of success on the merits. That analysis requires the court to consider the merits of plaintiffs' claim under the appropriate legal standard for review of that decision. Of particular importance in this action is NEPA's requirement that the agency prepare an Environmental Impact Statement ("EIS") for any "major" federal action which will "significantly" affect the "human environment.[10]" In this action, the parties acknowledge that the action is federal and major; the only issue affecting the decision to prepare an EIS is whether the action's environmental impact is "significant." To determine if an action's threatened impacts are significant, the agency must prepare an Environmental Assessment ("EA"), followed either by a Finding of No Significant Impact ("FONSI") or, if the impact is found to be significant, the creation of an EIS. 42 U.S.C. § 4332(2)(C).[11]

In this action, plaintiffs challenge the FWS's decision that it was unnecessary to prepare an Environmental Impact Statement ("EIS") for the proposed issuance of the two ITPs at issue. The FWS issued the ITPs without preparation of an EIS because they found the impact insignificant; that determination centered on the effects on the endangered Alabama Beach Mouse and its habitat. Plaintiffs assert that this Finding of No Significant Impact

("FONSI") was arbitrary and capricious, in violation of NEPA, the APA and the ESA.[12]

In *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989), the Supreme Court addressed the scope of review of an agency decision not to prepare an EIS. The case involved preparation of a supplemental EIS, but the Court noted that the standard was identical to that for an EIS in the first instance. *Id.* at 374, 109 S.Ct. 1851. The Court held that court review of such a decision was subject to the APA's "arbitrary and capricious" standard. *Id.* at 375–76, 109 S.Ct. 1851. The Court noted, however, that there is little difference between this standard and the "reasonableness" standard previously applied in this and other Circuits. *Id.* at 377 n. 23, 109 S.Ct. 1851 (citing *Manasota–88, Inc. v. Thomas*, 799 F.2d 687, 692, n. 8 (11th Cir.1986)). This holding expressly overruled prior precedent from several circuit courts, including the Eleventh Circuit, *National Wildlife Federation v. Marsh*, 721 F.2d 767, 782 (11th Cir.1983), which had applied the reasonableness standard of review.

■ In reviewing the agency's action under the arbitrary and capricious standard, the court considers whether the agency acted within the scope of its legal authority, whether it has explained its decision, whether the facts on which it pur-

---

**10.** The phrase "human environment" has been defined as the physical or natural environment. See e.g. *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 103 S.Ct. 1556, 75 L.Ed.2d 534 (1983). However, where an action has a primary impact on the physical environment, it has been held that factors other than the physical environment may be considered in determining whether an EIS is issued. See *Jackson County, Mo. v. Jones*, 571 F.2d 1004 (8th Cir.1978)(considering socioeconomic effects in relocation of military and civilian employ-

ees); *Maryland–National Capital Park and Planning Comm'n v. U.S. Postal Service*, 487 F.2d 1029 (D.C.Cir.1973) (aesthetic considerations).

**11.** Alternatively, the agency may assume significance, and proceed directly to preparation of an EIS.

**12.** However, the plaintiff's complaint does not contain a claim under the ESA due to the sixty-day notice requirement for citizen suits under that Act.

ports to rely have some basis in the record, and whether the agency considered the relevant factors. *Overton Park,* 401 U.S. at 415–16, 91 S.Ct. 814.[13] This determination is necessarily based on the record presented by the agency as the basis for its decision.[14] The court defers to the expertise of the agency, may not substitute its judgment for that of the agency, must limit its review to the record at the time the agency acted, and may not consider subsequent matters. *Overton Park,* 401 U.S. at 414, 91 S.Ct. 814. The court "must judge the propriety of [the agency's determination] solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action." *ICC v. Brotherhood of Locomotive Eng'rs,* 482 U.S. 270, 290, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987).

> *Overton Park* ... vastly expanded the range of arbitrary and capricious review under § 706(2)(A).... *Overton Park*

added teeth to arbitrary and capricious review: when applying arbitrary and capricious review to an agency decision, a court must "engage in a substantial inquiry ... a probing in-depth review...." 401 U.S. at 415, 91 S.Ct. 814.

The Court further observed that to "find arbitrariness, the court must consider whether the decision was based on a consideration of relevant factors and whether there has been a clear error of judgment." *Id.* at 416, 91 S.Ct. 814, 401 U.S. 402, 91 S.Ct. 814. While "[t]he court is not empowered to substitute its judgment for that of the agency," it must engage in a "searching and careful" inquiry into the facts. *Id.*

*Sierra Club v. Peterson,* 185 F.3d 349 (5th Cir.1999).

### 2. NEPA

The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq.,* requires all federal agencies to consider the

---

**13.** The APA, 5 U.S.C. § 706, provides in pertinent part:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—...
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D) without observance of procedure required by law;
>
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
>
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**14.** Plaintiffs objected at the hearing to introduction of evidence outside the record. The court withheld ruling on that objection and allowed the testimony to proceed. Plaintiffs' counsel was to provide authority for those objections in plaintiff's Reply brief, at which time the court would determine whether the additional evidence should be considered in connection with any or all of the preliminary injunction factors. As plaintiffs' Reply does not address that issue, it appears that plaintiffs have withdrawn their objection. Further, with regard to the merits, a court may consider evidence outside the administrative record as necessary to explain agency action. See e.g. *Natural Resources Defense Council v. U.S. Army Corp. of Engineers,* 2001 WL 1491580, *8 n. 19 (S.D.Fla.2001).

effects of their projects on the human environment. The Supreme Court has described NEPA's requirements.

> NEPA does not work by mandating that agencies achieve particular substantive environmental results. Rather, NEPA promotes its sweeping commitment to "prevent or eliminate damage to the environment and the biosphere" by focusing Government and public attention on the environmental effects of proposed agency action. By so focusing agency attention, NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct. Similarly, the broad dissemination of information mandated by NEPA permits the public and other government agencies to react to the effects of a proposed action at a meaningful time.

*Marsh,* 490 U.S. at 371, 109 S.Ct. 1851(internal citations omitted).

The Act is a purely procedural statute, and does not impose substantive requirements.

> In this case, for example, it would not have violated NEPA if the Forest Service, after complying with the Act's procedural prerequisites, had decided that the benefits to be derived from downhill skiing at Sandy Butte justified the issuance of a special use permit, notwithstanding the loss of 15 percent, 50 percent, or even 100 percent of the mule deer herd. Other statutes may impose substantive environmental obligations on federal agencies,[15] but NEPA merely prohibits uninformed—rather than unwise—agency action.

*Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350–51, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).

■ Under Eleventh Circuit precedent, there are four criteria to be considered in determining whether an agency's decision not to prepare an EIS is arbitrary and capricious:

> First, the agency must have accurately identified the relevant environmental concern. Second, once the agency has identified the problem it must have taken a "hard look" at the problem in preparing the EA. Third, if a finding of no significant impact is made, the agency must be able to make a convincing case for its finding. Last, if the agency does find an impact of true significance, preparation of an EIS can be avoided only if the agency finds that changes or safeguards in the project sufficiently reduce the impact to a minimum.

*Hill v. Boy,* 144 F.3d 1446 (11th Cir.1998); see also *North Buckhead Civic Assn. v. Skinner,* 903 F.2d 1533 (11th Cir.1990)(adopting arbitrary and capricious review in all NEPA cases reviewing agency decisions).

Section 10 of the Endangered Species Act of 1973, ("ESA"), 16 U.S.C. § 1339(a)(1)(B), provides that the FWS may issue an "Incidental Take Permit" under certain conditions to allow a "take"

---

**15.** The *Robertson* opinion contains the following footnote (number 14) at this point, which states:

> See, *e.g.*, the Endangered Species Act of 1973, 87 Stat. 892, 16 U.S.C. §§ 1536(a)(2) (requiring that every federal agency "insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species"); the Department of Transportation Act of 1966, 49 U.S.C. §§ 303 (Secretary of Transportation may approve "use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge ... or land of an historic site ... only if ... there is no prudent and feasible alternative to using that land; and ... the program or project includes all possible planning to minimize harm to the [area] resulting from the use").

*Id.* at 351, n. 14, 109 S.Ct. 1835.

of a threatened or endangered species which would be otherwise illegal under the Endangered Species Act, where the take would be incidental to some other lawful purpose. As part of the permit process, the applicant is to develop and submit a conservation plan for the remainder of the species. 16 U.S.C. § 1539(a)(2)(A); 50 C.F.R. § 17.22(b)(1) and 17.32(b)(1). The plan must "specif[y] ... the impact which will likely result from such taking," and the FWS shall issue an ITP *only* if it finds several facts, including that "the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild." 16 U.S.C. § 1539(a)(2)(B)(iv). This provision formed the basis of the agency's decision to issue the ITPs and also underscores its determination of significance under the CEQ regulation. However, as noted above, plaintiffs do not bring a claim for violation of the ESA at this point in the action. The parties do not contest that the ITPs at issue constitute major federal action. The plaintiffs do not challenge any effect other than the impact on the Alabama Beach Mouse and its habi-tat.[16] However, on that issue the parties are at loggerheads.

As currently presented, the issue is whether plaintiffs are entitled to a preliminary injunction against further construction premised on the ITPs; as part of that determination, the court considers the likelihood that plaintiffs will ultimately prevail on the merits. Plaintiffs challenge the FONSI under NEPA as arbitrary and capricious, and assert that the FWS failed to make a convincing case for the finding of no significant impact. They assert that the ITPs should not have issued without preparation of an EIS. Defendant asserts that its finding of no significant impact was properly supported, and alternatively that, even if the action were significant, the Habitat Conservation Plan reduces that effect to insignificance. *Hill v. Boy, supra.*

The Center for Environmental Quality ("CEQ") has issued regulations governing the NEPA process. Of particular note is 40 C.F.R. § 1508.27, in which the CEQ identifies ten factors to be considered in determining whether the threatened impact of an action is significant.[17]

---

**16.** The proposed developments also may result in the "take" of three other threatened or endangered species of marine turtle. Plaintiffs expressly state that the instant action does not address those species.

**17.** Title 40, Section 1508.27 of the Code of Federal Regulations states:

"Significantly" as used in NEPA requires considerations of both context and intensity:

(a) Context. This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

(b) Intensity. This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

■ An environmentally significant action need not involve a threat of extinction to a federally-protected species. Lesser impacts, including impacts on non-listed species, can constitute a significant effect. See e.g. *Makua v. Rumsfeld,* 163 F.Supp.2d 1202, 1218 (D.Hawai'i 2001) (distinguishing the ESA standard of "jeopardy" from the NEPA standard of significant impact.); *Environmental Defense Fund, Inc. v. Massey,* 986 F.2d at 536. However, the involvement of a federally protected threatened or endangered species and the possibility of a threatened impact as potentially serious as extinction or extirpation from a traditional habitat are factors weighing in favor of a finding of significance. Another factor of particular relevance in this action is the existence of uncertainty regarding the environmental effect of the proposed action. 40 C.F.R. § 1508.27(b)(5).

> (6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.
> (7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.
> (8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.
> (9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.
> (10) Whether the action threatens a violation of Federal, State, or local law or

## IV. *Facts*

### A. *Agency Findings at Time of Listing*

In 1985, the Fish and Wildlife Service published its Final Ruling listing the Alabama Beach Mouse as an endangered species and designating its critical habitat. 50 Fed.Reg. 23872.[18] That document contains a description of the beach mouse subspecies, its situation, and its historical and current habitat. The findings made at that time have not been amended, though the FWS is considering whether to amend the designation of its critical habitat.

The Alabama Beach Mouse was one of sixteen recognized subspecies of *Peromyscus polionotus,* otherwise known as the old field mouse.[19] The Alabama Beach Mouse was originally found on coastal dunes from Fort Morgan (at the eastern tip of fort Morgan Peninsula) to Alabama Point and on Ono Island, as well; all of those locations are on the Gulf Coast of Baldwin

requirements imposed for the protection of the environment.

**18.** The petition had originally been filed on October 26, 1982. Before publication of the final rule in 1985, the original critical habitat designation had to be significantly amended in recognition of further losses of habitat to development during the pendency of the petition. *Id.* at 23877–78.

The Alabama Department of Conservation and Natural Resources had already listed the Alabama Beach Mouse as endangered some years previously. According to the FWS, in 1979, the Alabama Department responded to a FWS inquiry regarding priority ratings for species which might merit addition to the federal list of endangered species. "The Department stated that the Alabama and Perdido Key beach mice should have the highest listing priority for mammals in Alabama." *Id.* at 23873.

**19.** The final rule involved three related subspecies endemic to the beaches and sandy fields of southern Alabama and northwest Florida: the Alabama Beach Mouse, and the Perdido Key Beach Mouse, and the Choctawhatchee Beach Mouse. *Id.*

County, Alabama. The Service noted that a 1983 study had determined that the Alabama Beach Mouse survived on "disjunct tracts of the sand dune system from Fort Morgan State Park to the Romar Beach area, but [has] apparently disappeared from most of its original range, including all of Ono Island."

At the time of listing, the Service made extensive findings concerning the perils which the Alabama Beach Mouse had endured and which it continued to face. It had been extirpated from much of its original habitat. It suffered a severe decline in population due to "human and natural alteration of coastal ecosystems." The Service found that "most suitable habitat has been lost because of residential and commercial development, recreational activity, beach erosion, and vegetational succession. Competition from introduced house mice (Mus musculus) and predation by domestic cats (Felis catus) also seem to be problems. Tropical storms are a constant threat to the remnant, fragmented populations of beach mice." "Residential and commercial development have already iso-

lated the remaining areas of beach mouse habitat, fragmenting populations. Because of the history of devastating tropical storms, often extirpating beach mice, it is necessary to maintain several suitable areas of habitat, irrespective of ownership, if the beach mice are to have a reasonable chance of survival and recovery." The agency stated that "[a] substantial decline of beach mouse habitat, through destruction or adverse impact by development, has been noted just since data were collected for the proposed rule of June 7, 1984." [20] The FWS concluded that "[t]he major threat to beach mouse habitat continues to be human destruction of the coastal sand dune ecosystem for commercial and residential development."

In designating critical habitat,[21] the FWS relied on a 1983 study which concluded that "the minimum area needed to maintain a population of beach mice is 50 hectares (ha) (124 acres (A)), that preferable habitat size is at least 100–200 ha (247–494 A), and that there should be natural corridors for migration between areas." [22] The Service determined that "[t]he protection of several separate areas of habitat for

**20.** The final rule states that, for the Alabama Beach Mouse, the additional loss of habitat during the period from the initial identification of critical habitat on June 7, 1984 to the preparation of the final rule on June 6, 1985, was 126 hectares, or 313 acres.

**21.** In its 1985 ruling, the FWS defined critical habitat as follows:.

Critical habitat, as defined by Section 3 of the [Endangered Species] Act means: (i) the specific areas within the geographical area occupied by a species, at the time it is listed in accordance with the Act, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection, and (ii) specific areas outside the geographical area occupied by a species at the time it is listed, upon a determination that such areas are essential for the conservation of the species.

The critical habitat is not all of the habitat which the species actually occupies or uses. In the case of the ABM, critical habitat con-

sists principally of primary and secondary dunes, though some other habitat types have been designated in relatively small quantities. The record indicates that ABMs use other areas, as well, particularly inland areas in times of innundation of the critical habitat due to storm or possibly in times of population pressure.

Optimal Habitat is defined in the BO as "1) an area that is undisturbed and is composed of at least 50 percent seed producing plants (food); 2) an area containing at least 50 to 80 percent cover nesting in a mixture of primary/secondary dunes, escarpment and adjacent scrub; 3) a habitat mixture where the escarpment lies between 0 to 900 ft from the primary and secondary dunes and 4) an area where the adjacent scrub lies between 0 to 300 ft from the escarpment." Tab 8, § B.1.b, p. 88. The Service found that the project area meets all of these requirements. *Id.*

**22.** The FWS designated the following as the critical habitat of the Alabama beach mouse in 1985:

Alabama. Areas of land, water and airspace in Baldwin County with the following com-

each species of beach mouse is essential for the conservation of these animals. Should a species of beach mouse exist in only one small stretch of suitable habitat, it would be much more vulnerable to extinction through the effects of tropical storms and other deleterious factors."

In designating the critical habitat of the three subspecies of beach mice, the FWS held that

> Section 4(b)(8) of the [Endangered Species] Act requires, for any proposed or final regulation that designates critical habitat, a brief description and evaluation of those activities (public or private) which may adversely modify such habitat or may be affected by such designation. **Activities most likely to adversely modify the critical habitat of the three beach mice are the continued destruction of sand dunes for residential and commercial development.** Indiscriminate pedestrian and vehicular use also adversely impacts the sand dunes.

50 Fed.Reg., at 23881 (emphasis added).[23]

In denying a request by the Federal Highway Commission and the Florida Department of Transportation to exclude ex-

ponents (St. Stephens Meridian): (1)That portion of the Fort Morgan Peninsula south of State Road 180 and west of 87 degrees 59'35" W. except for that part each of Fort Morgan State Park and more than 152.5 meters (500 feet) inland from the mean high tide line of the Gulf of Mexico; (2) those portions of T9S R3E Sec. 30 and T9S R2E Sec. 25–28 and E 15/16 Sec. 29 extending 152.5 meters (500 feet) inland from the mean high tide line of the Gulf of Mexico; (3) that portion of the Gulf Shores State Park south of State Road 182 in T9S R4E Sec. 14–15 and Sec. 21–23.

Within these areas the major constituent elements that are known to require special management consideration or protection are dunes and interdunal areas, and associated grasses and shrubs that provide food and cover.

50 Fed.Reg., at 23885.

isting rights of way from the designation of critical habitat for the two other beach mice addressed in the final rule,[24] the FWS stated that "[p]rotection of the remaining habitat is **essential** for the long-term survival and recovery of the beach mouse." *Id.* at 23878 (Emphasis added)

### B. Relevant Portions of the Administrative Record

The proposed development involves two adjacent tracts totaling 196.5 acres of ABM available habitat.[25] The two developments, while separate, are treated together because the developers offer a consolidated Habitat Conservation Plan and sought joint consideration. The projects involve construction of large condominium developments near the Gulf of Mexico on the Fort Morgan Peninsula in Baldwin County, Alabama.

The construction is expected to destroy 58.9 acres of beach mouse habitat, through conversion to paved and other impervious features, including buildings, roads, patios, pools, ponds, tennis courts, a club house, shops, a medical facility, and a fire station, as well as and open areas planted in grasses, trees and shrubs. Six 20–story condo-

**23.** The Service also noted that the Federal Emergency Management Agency "indicated on October 9, 1984", that it has a requirement through the NFIP to " 'prohibit man-made alteration of sand dunes ... which would increase potential flood damage.' As a result of this requirement, FEMA believes that alteration of the sand dune system should be significantly reduced." *Id.*

**24.** The request covered only habitat located in Florida. This holding is nonetheless relevant, as the FWS has held that the three subspecies of beach mouse are "environmentally equivalent." 64 Fed.Reg. at 63004.

**25.** The developers own 180.5 acres; the inclusion of existing Rights of Way within the project area brings the total acres in the site to 196.5.

miniums ware to be built, as well as thirteen single-family units, and a commercial development which will also contain additional housing.

Intervenors assert that their project will impact only .35 acres of critical habitat. The Habitat Conservation Plan ("HCP") submitted by the developers includes a proposal to set aside 105.5 acres of the 196.5 acre tract in perpetuity for the protection of the Alabama Beach Mouse, and also provides for certain other mitigating steps.

One notable aspect of the mitigation is the protection of land on which an ITP had previously been granted. The developers have purchased the 17 acre tract on which the FWS had previously granted an ITP for a development known as "French Carribean Plantation Resort." That proposed development would have led to the destruction of approximately 3.7 acres of habitat. The current HCP would protect that tract from development. By setting aside this 17–acre tract as part of the beach mouse habitat "preserve", the developers have in effect rescinded the prior ITP and reduced the cumulative effects of prior ITPs.[26]

The Intervenors also tout their plan to grade the dunes in front of their buildings, rather than erect a retaining wall. While it is true that the slope of sand will avoid the creation of another physical barrier[27] to Beach Mouse movement from the shore to locations farther inland, it has not been established that the mice will use that slope for that or any other purpose. The developers plan to re-plant this area with native vegetation, and making it possible that the ABMs will use this are for foraging; nonetheless, the slope appears unsuitable for habitation.

Despite the mitigation measures, however, the record clearly indicates that the projects will cause the loss of 58.9 acres of ABM habitat. Of that, 34.5 acres are considered "optimal habitat."

The agency designated a 711–acre "action area," upon which it focuses in addressing significance. The FWS calculates the relative loss of habitat as a result of these projects as follows:

8.3 percent of the total available ABM habitat in the action area.

20 percent of the total optimal ABM habitat in the action area.

5.6 percent of the total available ABM habitat range-wide.

13.3 percent of the total optimal ABM habitat range-wide.

The projects will also destroy 68 percent of the escarpment on the project site: 1935 linear feet of escarpment out of a total of 2844 linear feet on the property will be permanently affected.

The HCP is intended to reduce the adverse effects to the beach mouse in the 196.5 acre tract as a whole. It does not purport to "undo" the destruction of that portion of ABM habitat. Some less drastic effects will also be felt in the remaining portions of the tract and in the remainder of the project area, as well, but the court will presume for purposes of this opinion that these other effects are to be successfully minimized under the plan to the point of insignificance.

---

**26.** The agency did not address the preservation of this tract as a direct offset to the 58.9 acres of habitat to be destroyed under this proposal; this court treats the matter similarly, but notes that the offset of 3.7 acres would not greatly diminish the impact of the loss of 58.9 acres of habitat. The record before the court does not indicate that any of the 3.7 acres were optimal habitat, and thus does not support any offset against losses of optimal habitat due to the two ITPs at issue.

**27.** The FWS found that the buildings themselves, which will be sited inland of the slope, create a physical barrier to movement inland.

Since the species was listed in 1985, it has continued to lose habitat. The Biological Opinion contains a table providing habitat loss figures for nine (9) projects within the 771 acre action area. See Record, Tab 8, Table 12. That table shows that 337 acres of habitat were lost to large-scale development in the action area between 1985 and 1996.[28] Further, in 2001, the developers of Kiva Dunes announced a proposal to build high-rise condominiums where the plat (and ITP application) provided for single-family residences.[29] Development of single-family structures on individual lots has also contributed to the loss of habitat.

## V. *Discussion*

Plaintiffs' two most persuasive challenges to the Service's Finding of No Significant Impact, and thus to the resulting decision to issue the ITPs without preparation of an Environmental Impact Statement, are as follows:

1) that the planned destruction of such a large portion of the ABM's remaining habitat, particularly optimal habitat, is so clearly significant that the FWS's FONSI was "a clear error of judgment," *Sierra Club v. Peterson*, 185 F.3d 349 (5th Cir.1999)(citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 414, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)), especially where the affected species is endangered *because* of prior losses of habitat and has suffered large losses of habitat since listing; and that the agency's failure to explain and support its counter-intuitive conclusion of insignificance renders the FONSI arbitrary and capricious under the third element of the test identified in *Hill v. Boy*, 144

F.3d 1446 (11th Cir.1998) ("if a finding of no significant impact is made, the agency must be able to make a convincing case for its finding."); see also *Overton Park, supra* (in reviewing agency action under arbitrary and capricious standard, court to consider whether the agency has explained its decision); and 2) that the agency's admitted uncertainty concerning such central issues as the effect of destruction of optimal habitat on the Alabama beach mouse renders the finding of no significant impact arbitrary and capricious.

The court finds that plaintiffs have demonstrated a substantial likelihood of success on the merits on each of these issues. The court also notes but does not decide various other subsidiary questions raised in this case.

### A. *A Clearly Significant Impact:*

 It seems almost beyond question that the destruction of 20% of an endangered species' "optimal habitat" (defined to include all habitat needed by the species), on top of post-listing losses of optimal habitat of approximately 20%, for a species which was rendered endangered by pre-listing losses of habitat, will have an impact on that species which is "significant" under any reasonable definition of that term. The FWS reached the opposite conclusion, and does not adequately explain this apparently unsupportable determination.

The factors listed in the CEQ regulation do not lead to an easily quantifiable result. Despite the fact that the FONSI lists and addresses each of the ten factors [30] identi-

---

**28.** Because of the special protections given to designated critical habitat, a disproportionate amount of these prior losses of optimal habitat are likely to have been to escarpment and adjacent scrub habitat types.

**29.** Habitat losses in the rest of the range from the other eight (8) ITPs issued since 1985 were not discussed. The court is concerned by the lack of cumulative impact data for the whole range.

**30.** With regard to factor (2) concerning im-

fied by the CEQ in its regulation defining "significantly," the FWS does not clearly state how it weighed or balanced those factors or how it reached its determination of no significant impact under that framework. Nor, despite the inclusion of large amounts of data, findings and analysis, has the agency answered how such a large absolute and relative habitat loss can be said not to be significant.

The FWS stated that the loss of an acre in one location would have a different impact than an acre from another location. One might therefore expect the Service to claim that the large loss of habitat would not significantly affect the ABM because the land was not used by the species, or was not important to the species. Instead, trapping data indicates that the species uses the land which is to be destroyed,[31] and a large part of that affected land consists of "optimal habitat." Defendant does not offer data concerning the population living on or using the 58.9 acres, because it does not have such information.

An agency could potentially conclude that a large loss of habitat might not significantly affect the beach mouse if the species did not react to the loss of habitat. In this case, however, the beach mouse was found to be endangered precisely because of population losses due to the loss of its traditional habitat. Further, habitat destruction has continued since the species was listed; the species lost 24% of its

optimal habitat range-wide and 20.6% of its optimal habitat in the action area since it was listed in 1985. Almost all of that habitat loss has been due to development, most of which has been built pursuant to ITPs previously granted by the FWS.

An agency could perhaps argue that it does not deem it necessary to prepare an EIS because it has previously prepared Environmental Impact Statements for one or more of the prior ITPs, either those in the action area or at least one outside that area. However, that is not the case. Though the Service has issued numerous ITPs for the beach mouse, it has never prepared an EIS.[32]

An agency could argue that the loss of habitat in the action area would only affect the local colony, and would not significantly affect the species as a whole. First, local extirpation can be a significant impact. Second, the beach mouse must exist in several discrete, but connected, colonies so that local extirpation from storms, succession of the food-producing plants, or other environmental factors does not affect all of the colonies at once, and also for other reasons such as the need for breeding between the separate populations.

Fragmentation of the available habitat is another habitat-related problem for the ABM. Otherwise useful habitat which is cut off from other occupied habitat is not useful to the ABM if the area is too small

---

pacts to public safety and health, the FWS deferred to a ruling by the Baldwin County Commission approving the projects. The portions of the record presented to the court do not include a factual or legal basis for the conclusion of the FWS that the specific decision by the Baldwin County Commission purported to be a determination that the projects would not result in significant impacts to public safety and health. The court does not reach a determination of this issue.

With regard to factor (4) concerning the degree of controversy, the FWS concluded

that, despite 55 pieces of correspondence objecting to the projects, the level of controversy was not significant. The court does not here consider the propriety of that determination.

31. The FWS found that the construction would directly affect 58.9 acres of occupied habitat, including 7.4 acres of primary and secondary dunes, 13.0 acres of escarpment, 14.1 acres of adjacent scrub, and 24.4 acres of interior scrub (Tab 7(EA) section 4.8.1).

32. Nor has the agency ever denied an ITP for the beach mouse.

or insufficiently diverse to support a colony. Even if the area is large enough, the colony can have too little genetic variety in the absence of recruitment from outside the colony. Also, if the population is extirpated from the area, there is no natural means of re-population.

Barriers to movement between the shore and interior dunes and scrub also adversely affects the species. When primary and secondary dunes are inundated by storms, the mice need to be able to seek shelter temporarily in interior habitat. Further, the mice need to be able to reach interior habitat for foraging and habitat, particularly when population pressure increases, either due to increases in population or decreases in available habitat or in food supply.

The agency acknowledges that it does not know what constitutes barriers to movement along the shoreline (east to west) or between the shore and interior habitat (north to south) The agency further acknowledges that the planned buildings will act as a barrier to north-south movement. Additionally, the agency, though unsure what effect the loss of escarpment will have, notes that the damming effect of the buildings coupled with the loss of escarpment will deflect storm surges toward adjacent interior habitat, making flooding more likely. Tab 7(EA) section 4.8.2, p. 62. The agency has not addressed the effect of this additional flooding of interior habitat on the beach mice, particularly on their access to interior habitat and their use of interior habitat as a refuge from storms.

The FWS has not clearly addressed how much contiguous habitat will remain. The HCP calls for preservation of 105.5 acres. Intervenors add several corridors for passage of the ABM between contiguous tracts of habitat, and assert that their projects will leave the ABM with approximately 140 acres of habitat. This gerrymandering is a questionable analytical approach. Further, the FWS does not have reliable data on the minimum habitat requirements for a viable beach mouse colony. An early study concluded that the ABM needed at least 50 hectares (124 acres) but should preferably have two to four times that much habitat available.[33] Intervenors note that their calculation of gerrymandered habitat slightly exceeds the smallest rough estimate of minimum habitat, and claim this as proof that the loss of habitat will not have a significant impact on the species. This argument in specious. The use of figures rounded to the nearest half-hundred hectares indicates that the estimate was not intended as a precise measure of minimum habitat requirements. It is certainly not precise enough to warrant Intervenors' conclusion. Even if the estimate were intended to be precise and took into account different types of habitat needed[34], the argument that the project will have little impact on the species because Intervenors' plan will leave slightly more habitat than the lowest estimate of minimum habitat requirements is not supportable; significant impacts could include adverse effects not just on survival but on recovery and maximum supportable population size.

The Service notes that the action area "currently has a relatively low population": which it "believes" to be due to the species' failure to recover from losses due to prior storms and other factors which locally reduced the food supply. (Tab 8(BO) section VI, pp. 91–92) The loss of 58.9 acres of habitat which includes food sources for the

33. Of course, an area of habitat must have sufficient amounts of several habitat types in order to be suitable for the support of one or more colonies.

34. This conclusion was not the focus of the study, and was only marginally supported. It is notable that the FWS does not use this estimate to directly support its determination.

ABM, and additional losses of individuals, would be likely to have a greater-than-usual impact on the local population and its recovery because of current conditions in that area. Further, the Service lacks a reliable estimate of the minimum population requirements for long-term viability and recovery. Without this information, any conclusion regarding the health of this colony despite the killing of mice and the loss of burrows and forage by construction is flawed. Further, there was evidence presented to the FWS that the ABMs had lost so much habitat that they were at or near the point at which they could not survive or recover, particularly if subjected to storms and other environmental risks, or if they suffered additional habitat losses.

This court had previously remanded ITPs on the basis of lack of necessary data, including the lack of an estimate of minimum population necessary for survival and recovery,[35] and the lack of estimates of range-wide population and distribution within the range. Defendant has focused on this prior decision in the instant action. However, the agency does not offer that information. Instead, the agency's analysis focuses on losses of habitat instead of population as the basis of its determination.[36] The agency claims that this habi-

tat-based analysis can better be translated (by some means not made clear) into a more reliable analysis of the effects of the loss of habitat on the species. However, the agency lacks a reliable estimate of the minimum habitat requirements of the species with which to compare any loss of habitat. Because the remaining habitat left by the projects at issue is near or below the agency's only general estimate for minimum habitat, the court finds that a determination of insignificance is unsupportable in the absence of a reasonably reliable estimate of minimum habitat requirements to analyze the significance of the impact of such loss on the ABM's viability and recovery in this area.[37]

Under these circumstances, the court cannot accept defendant's largely implicit conclusion that the effects of a cumulative loss of occupied and optimal habitat of this magnitude on the beach mouse is so insignificant that preparation of an EIS is not required. Despite mountains of data,[38] this crucial, counter-intuitive conclusion goes largely unexplained. The court thus finds that plaintiffs have a substantial likelihood of demonstrating that the record does not adequately support the conclusion that losses of 20 percent of optimal habitat in the action area, on top of prior losses of approximately 20.6 percent of optimal hab-

---

35. The court held "Without knowing the minimum viable population the FWS cannot reasonably estimate the extent of the impact the additional takings will pose, and thus, without this data the FWS cannot reasonably state that the projects will not have a significant impact." *Sierra Club v. Babbitt, supra.* Leaving aside any preclusive effect which the court's decision in that case might have in the instant action, the court will presume for purposes of this motion that the habitat analysis is a suitable alternative, and that minimum population data is not generally necessary to reach a conclusion. As noted herein, the court nonetheless finds that minimum population is relevant to certain conclusions reached by the agency.

36. This focus on habitat also presumably means that relatively few non-habitat factors are relevant to the analysis and to the determination that significant habitat losses will not significantly affect the ABM.

37. Because there was evidence before the agency that the ABM may be at or near the point at which they cannot survive in the face of further losses of habitat.

38. Defendants and Intervenors point to the data on other points to show that the agency was thorough and took a hard look at the issue. These arguments do not affect the very substantial hole at the center of the FONSI; a hole is still a hole, regardless of how much material is collected around it.

itat in the action area, will not cause a significant effect on the Alabama beach mouse.

### 1. Mitigation:

■ The defendants and intervenors assert that, even if the projects are found to threaten a significant impact, that impact is mitigated to insignificance by the proposed Habitat Conservation Plan.[39] Based upon the record presented, the court cannot agree. At this stage, it appears that plaintiffs are likely to prevail on this argument, as well.

The CEQ regulation defining significance states that "[a] significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial." 40 C.F.R. § 1508.27. This provision appears to be directly applicable to this aspect of the instant action. Despite all of the beneficial aspects of the HCP, particularly as to the 105.5 acres to be protected, the destruction of 20 percent of the remaining optimal habitat in the action area can nonetheless be a significant environmental impact regardless of what beneficial measures may also exist.

However, the FWS ignores this provision, citing instead provisions which allow the agency to find that mitigation measures will reduce an otherwise significant environmental effect to insignificance. See *Hill v. Boy, supra* ("if the agency does find an impact of true significance, preparation of an EIS can be avoided only if the agency finds that changes or safeguards in the project sufficiently reduce the impact to a minimum."). Construing this language in the context of the CEQ regulation cited above, the court finds them to be consistent, and that the CEQ's provision is applicable to the instant ITPs. The mitigation measures, admittedly beneficial and admittedly minimizing many of the lesser adverse effects of this action, do nothing to lessen the irreducible destruction of habitat found by the agency.

The remaining elements of the HCP relate to mitigating lesser effects on the habitat; they likewise do not alter the fact that habitat will be lost through more direct and concrete effects.[40] Throughout this opinion, however, the court has focused on the loss of habitat, including the loss of optimal habitat, directly and permanently resulting from the construction of structures on the ABM habitat. Even if the court were to presume that the HCP would completely reduce any effect on that 105.5 acres portion of the 196.5 acre tract at issue to insignificance,[41] the HCP will

---

**39.** Such an alternative finding poses a conceptual problem: if the FWS does not recognize the significance of the action in the first instance, how can it thereafter claim to understand the extent or nature of that significance and judge the effect of the proposed mitigation efforts in balancing or minimizing those effects? Nonetheless, the court does not reach that issue in ruling on the instant motion.

**40.** One aspect of the HCP may be deemed to reduce the net loss of habitat, the protection of the "French Carribean" property. The record does not indicate that any of that 3.7 acres of habitat was optimal or critical habitat. The agency record does not address this acreage as a direct adjustment to the habitat losses under the instant ITPs; the court will not alter that analysis and thus risk double-counting or improperly ignoring this mitigation effect. Regardless, even if the court were to subtract 3.7 acres from the total habitat to be destroyed as a means to address the net loss of habitat, the result would be unchanged.

**41.** Such a conclusion is not warranted. The FWS definition of the "action area" recognizes that indirect effects are likely to extend throughout the 196.5 acres and into areas outside the property owned by the developers. Further, it is not clear how the ABM currently utilize these areas, how many currently reside in the areas to be protected and destroyed, and what disruption to existing population groups may be caused by the loss of the particular acreage which is to be destroyed.

not "undo" that destruction, and will not create new habitat to replace that lost through this construction. The court's analysis based on the agency's findings of losses of habitat is unaffected by the mitigation measures.

### B. Uncertainty:

■ The reason for this lack of explanation becomes clearer. The agency admits at several places in its EA that **it lacks information on the effect loss of optimal habitat will have on the species.** (Tab7 (EA) Sections 4.4.4 (p.51); 4.8.1 (p. 61); 5.1.1 (p. 64)) In the absence of such fundamental information, it would seem that any alleged "finding" that the project will not significantly affect the species is the purest sophistry.

The agency also has noted other areas of uncertainty; the reliability of still other of the "facts" the agency relied on are called into question based on the assumptions made.

On November 8, 1999, the FWS announced its "90–day finding" on a petition filed by Sierra Club and others on February 2, 1999.[42] The petition sought an amendment of the critical habitat designation for the ABM and the two other subspecies of beach mouse which were listed with the ABM in 1985; the stated reason for the petition was the assertion that the current designated habitat was inadequate and coastal development had destroyed and would continue to destroy part of their habitat. The FWS found that "[a]vailable information and data indicate that secondary and scrub dune habitat may be essential to the survival and recovery of all three subspecies". (64 Fed.Reg. 63004 (November 19, 2999)).[43] Thus, the Service indicated almost two years ago that it would probably amend the critical habitat designation to include additional secondary and scrub dune habitat; however, because that process has not been completed, the instant ITPs are being granted on the basis of the old designation. The ITPs allow the destruction of habitat types which are "essential to the survival and recovery" of the ABM. The significance of this destruction to the ABM thus may be understated in the instant analysis due to the agency's delay in addressing this issue, and the protections granted to critical habitat are withheld from the optimal habitat destroyed under the current proposal.

Private development of single-family structures is another area of uncertainty. The EA states that there are approximately 180 undeveloped lots in the action area, averaging approximately 0.5 acres each, and more than 600 lots outside the action area but within ABM habitat on Fort Morgan Peninsula. Tab 7, section 5.1.2. The agency estimated that up to 40 new single family residence are constructed on Fort Morgan Peninsula annually, and that each single-family residence-if constructed on pilings as is common-destroys approximately 0.25 acres of habitat. Tab 7, section 3.10, pp. 31–32. The agency estimates that annual construction within the action area would be only 4 new residences per year, for an anticipated annual loss of habitat of 2 acres within the action area. *Id.*

---

42. Previously, on November 5, 1991, the Alabama Conservancy had filed an Emergency Petition for amendment of the critical habitat of the Perdido Key Beach Mouse. The FWS had found that amendment might be warranted, but that the amendment did not need to be handled on an emergency basis. (57 Fed. Reg. 5521(November 24, 1992)). The Service put off consideration of the amendment, and eventually issued its 12–month finding (58 Fed.Reg. 33606 (June 18, 1993)), finding amendment warranted, but delaying it indefinitely.

43. See *Sierra Club v. Norton,* CV 00–448 (S.D.Ala.)(litigation to force FWS to publish 90–day finding).

section 5.1.2. The factual basis for this estimate does not appear in the record.

Such construction is not presently regulated, but the FWS asserts that it "anticipates" that such construction will become regulated (at an undisclosed time "in the future") as a result of "a county-wide HCP or other section 10 compliance methodology." *Id.* The record, however, does not offer a factual basis for this conclusion, and thus for the optimistic assumptions that land undisturbed under an agency-issued ITP will remain undisturbed. Even if it is not the most probable outcome, it is at least foreseeable that additional losses of habitat due to unregulated construction of single-family residences could accelerate and cause substantial future losses of habitat in the action area.

However, as noted at the beginning of this section, the central area of uncertainty centers on the effects of the loss of habitat-particularly optimal habitat-on the species.

In the BO, the FWS included population data in an appendix. The agency notes that such population data was not the primary basis for their FONSI analysis. The Service decided instead to use a habitat-based assessment to determine the effect of the development on the beach mice. The FWS stated that "[t]he detailed discussion of ABM population data is included in Appendix B—Point 6. This information is placed in the Appendix because the **widely fluctuating characteristics of the ABM population makes it impossible to identify the impact of a development to the populations directly.** Therefore, we have determined to do the assessment as a result of acres of habitat that is used by the ABM and impacted by the development." TAB 8, BO, C.1. p. 28 (emphasis added).

Because of dramatic seasonal variations in ABM population, the Service analyzed trapping figures by month to estimate the population. The FWS found that data taken strictly from the grids did not include a population estimate for the entire Perdue Unit of the ABM's habitat and that the estimates were statistically insufficient to allow a range-wide estimate. Thus, the Service instead estimated ABM population in the action area by aerial photography. From the photographs, it identified similar habitat types and estimated the amount of such habitats. From that information, the FWS estimated a population of between 646 and 5,013 beach mice.

The court also notes with concern the wide range of the population estimate given;[44] it appears that the Service's estimates of population from habitat types (and vice versa) involve a substantial rate of error, at least when applied to a large area.[45] This error rate leads to substantial uncertainty in using these estimates, and may significantly limit their reliability and usefulness. Further, the record does not indicate that the stated error rate takes into account the issues as to which the agency admits a lack of knowledge of the effects of the proposed changes. The court further notes its concern that the

44. The estimate was a total population of between 646 and 5,013 beach mice in the action area. That estimate can be restated as an estimated population of 2,629.5 ± 2,183.5, or an acknowledged error range which is over 75% of the estimate itself.

45. The formula used by the FWS apparently involves an estimate of ABM population per acre of each habitat type, multiplication of those estimates by an estimate of the amount of each type of habitat in the action area, and finally a total of the resulting figures. If so, the estimate of total population would not be necessary to calculate an estimate of either the loss of population or the remaining population, but may be necessary to determine relative loss. It should be noted that the more estimates are factored into an equation, the greater the rate of error.

apparently simplistic habitat model may gloss over the agency's lack of information concerning the minimum requirements of the species, and may ignore what little is known of the minimum habitat requirements for individual ABM colonies.[46]

In order for the Service to use a habitat model to "identify the impact of a development to the populations [in]directly," the agency clearly must have a basic understanding of the effects of losses of habitat on the species. The agency found that the project would destroy 58.9 acres of ABM habitat, including 34.5 acres of optimal habitat. Optimal habitat for the species is identified as "those sections of coastal strand that contain a primary/secondary dune, escarpment and adjacent scrub. These habitats areas make up, based on current scientific information, all requirements necessary for ABM recovery and survival." Tab 8(BO) section I, p. 4.

Part of the optimal habitat is the federally-designated critical habitat, which is defined for the ABM as that portion of the relevant section of shoreline extending 500 feet inland from the mean high tide line of the Gulf of Mexico. Because it is closest to the shore, the critical habitat consists primarily of primary and secondary dunes.

The project will destroy approximately 34.5 acres of optimal habitat. According to the FWS, this constitutes 20 percent of the optimal habitat in the action area (172.2 acres), and 13.3 percent of the optimal habitat remaining in the entire range (260 acres). The FWS candidly acknowledges that it does not know what the effect of the loss of optimal habitat will have on the Alabama beach mouse. Tab 7(EA) 4.4.4; Tab 7(EA) 5.1.1.

Despite this lack of information, the FWS nonetheless claims to be able to determine that the loss will not have a significant effect on the ABM; that finding avoids the additional investigation required in preparation of an EIS which might provide the needed information. See also 40 C.F.R. § 1502.22 (CEQ regulation providing for means of addressing lack of certainty in context of EIS). The record does not explain how the FWS can overcome the lack of such information and reach a valid finding of insignificance. In the absence of information on what effect the loss of this key habitat type will have on the beach mouse, and particularly in view of the size of the loss, the court finds that plaintiffs have a substantial likelihood of demonstrating that the agency's FONSI

**46.** One study in the 1980s concluded that a colony of beach mice would require a minimum habitat area of at least 50 hectares (124 acres) but preferably 100–200 hectares (247–494 acres). The study which reached these conclusions does not appear to have been focused on that determination, and the basis for these conclusions is not clear. These estimates are not based upon specific habitat types nor on "critical" or "optimal" habitat classifications. The broad-brush nature of the estimates and the fact that they have not been tested lead the court to question whether they can form a reliable basis for the instant decisions.

Nonetheless, though this is the only available estimate on minimum required habitat, the FWS does not rely on these figures to justify its decision. The area to be preserved under the proposal is only 105.5 acres. This is below the smallest of the general estimates of minimum habitat needs.

The intervenors, however, argue that these estimates establish that their project will not reduce available habitat below the minimum required for survival of the ABM colony. They argue that, if the court includes the existing corridors required for ABM movement from one part of their habitat to another, the total area gerrymandered together would be approximately 140 acres of habitat. This figure is minimally above the smallest estimated minimum habitat size. However, these estimates are not sufficiently reliable to allow the conclusion that destruction of habitat, including optimal habitat, would have no significant effect on the beach mice so long as it leaves a contiguous area of habitat slightly in excess of the smallest estimate of the minimum habitat necessary for survival.

is inadequately supported by the record, and is thus arbitrary and capricious.

Though 34.5 acres of optimal habitat are to be destroyed, only approximately 0.35 acres of critical habitat will be affected; the majority of optimal habitat to be lost is escarpment and adjacent scrub. The proposed construction will destroy 1935 linear feet (68%) of the total 2844 linear feet of escarpment in the project area. The FWS acknowledges that it does not know what effect the loss of over 1935 linear feet of escarpment will have on the landscape or what effects might arise from wind-borne sand. The FWS also notes that the development will result in fragmentation of the ABM-occupied interior scrub habitat along 1935 feet of escarpment and would affect adjacent scrub areas to the north, and that it will act as a barrier to movement of the ABM. One effect it could predict is that "[l]oss of the escarpment and the damming effect of the buildings would deflect storm surges toward adjacent interior habitat, making flooding more likely."[47] Tab 7(EA), section 4.8.2. The agency does not separately address the effect of such flooding on the ABM, particularly on its access to the inland habitat (including the escarpment and adjacent scrub) or use of such areas as refuge from inundation of critical habitat during storm events.[48] In the absence of such information, the court finds that plaintiffs have a substantial likelihood of success on the merits. Additionally, the court questions the sufficiency of the discussion of the combined effects of all of the barriers to ABM movement created by the project,[49] but does not here decide that issue.

Though mentioned, the parties do not discuss the plaintiff's challenges to the use of the habitat model in place of the population-based analysis previously criticized by this court as incomplete. *Sierra Club v. Babbitt, supra.* Nonetheless, the court notes some concerns. The Service's estimate of population in the action area was made by extrapolation from a catalogue of the types of habitat in the action area. The effect on that population is estimated based on a similar cataloguing of the types and amounts of habitat lost compared to the baseline. Though the FWS asserted that the population data was not completely divorced from their analysis, the record does not clearly explain their method of determining population from a determination of the amounts and types of habitat affected, particularly in the absence of such basic information as that noted above.

*1. Uncertainty and the Need for an EIS:*

 It would seem self-apparent that uncertainty concerning the effects of important aspects of the proposed action on the ABM would preclude a "finding" that the effects of the proposed action on

---

**47.** The FWS also notes that other developments in the area had experienced erosion between buildings, and posited that the same thing might happen in this development.

**48.** As noted above, the species is threatened with loss of population and temporary loss of habitat from such inundation, and has been extirpated from some areas as a result of prior storms.

"Fragmentation of habitat, which can result in restriction of gene flow, can isolate small populations and subject them to increased probability of extirpation due to

stochastic effects. Barriers to ABM movement contribute to or cause population isolation. What constitutes a barrier to necessary ABM movement ... east and west through the project site, or north and south from dune habitats to the scrub is unknown. The effects of roads, extensive parking lots, tennis courts etc., as barriers to ABM movement is unknown".
Tab 7(EA), section 4.8.1.

**49.** The EA notes that "both the density and the extent of the population range in its [the ABM's] north south axis [ ] remain questionable."

the ABM would not be significant, and thus finding that the additional study which goes with preparation of an Environmental Impact Statement to be unnecessary. The defendants and intervenors assert otherwise, however, claiming that the Service was required to issue the permits unless they found that the action would jeopardize the species, and was required to make that determination on the basis of the best information available. NEPA was designed to prevent uninformed action. "NEPA requires each agency to undertake research needed adequately to expose environmental harms." *Save Our Ecosystems v. Clark*, 747 F.2d 1240, 1248 (9th Cir.1984) (citations omitted). Defendant's argument in this case would turn NEPA on its head, making ignorance into a powerful factor in favor of immediate action where the agency lacks sufficient data to conclusively show not only that proposed action would harm an endangered species, but that the harm would prove to be "significant."

The agency cites regulations which require the agency to issue the permits unless their findings preclude such action, and language limiting the agency's consideration to the "best scientific and commercial data available."[50] Title 50, section 17.22(b)(2) of the Code of Federal Regulations, established by the FWS, addresses the ITP application procedure under the Endangered Species Act.[51] It identifies the information which must be considered by the Director, and provides that he or she "shall issue the permit if he or she finds" various elements, including that "the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild." Similarly, 50 C.F.R. § 13.21(b) provides that "the Director shall issue the appropriate permit unless ... (4) The authorization requested potentially threatens a wildlife or plant population...."

[ ] These sections address the Director's duties under the ESA, rather than under NEPA. The ESA's "jeopardy" analysis is distinct from the "significant impact" standard of NEPA. See *Makua v. Rumsfeld*, 163 F.Supp.2d at 1218. Neither of these regulations addresses NEPA's preliminary determination: whether NEPA requires the agency to prepare an EIS in order to adequately assess these jeopardy issues under the ESA. As already noted, NEPA's requirement of an EIS does not apply if the agency determines that the action does not reach the threshold level of a significant environmental impact. NEPA's purpose is to avoid decisions made without adequate information. Uncertainty is a factor in determining the significance of an action. 40 C.F.R. § 1508.27.

40 C.F.R. § 1502.22 establishes a procedure for reaching a decision where the agency may lack sufficient information: it allows the agency to weigh the importance of the missing information against any barriers and costs to gathering such information.[52] Because this provision is only avail-

---

50. The CEQ is the agency created by NEPA to issue regulations concerning that Act. As discussed herein, the court finds the CEQ regulations to be consistent with those cited by defendants and intervenors. However, if the regulations were to be in conflict, the court would be required to defer in a NEPA action to the regulations drafted by the CEQ, as that agency was created by NEPA with the authority to issue regulations on its implementation.

51. The requirement that the agency use "the best scientific and commercial data available"

appears in sections 4 and 7 of the ESA. As the intervenors have repeatedly argued, the ESA is not at issue in this case brought under NEPA and the APA.

52. Section 1502.22 provides:

"When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is incomplete or unavailable information, the

able in the context of an EIS, it appears that uncertainty over the effects of an action would generally require the preparation of an EIS. Cf. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 354, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989)(Though uncertainty existed over data relevant to environmental decision, agency decision not flawed by failure to conduct worst case analysis where agency followed new provisions of § 1502.22).

The Service is not required to find a proposed project insignificant in the absence of readily available information to the contrary; rather, it is required to create an EIS for any project which may significantly affect the environment. Under NEPA, it cannot use the lack of existing information as a basis for acting without preparing an EIS. If information sufficient to reach the ultimate determination is not currently available, then the agency shall conduct an EIS, and may weigh whether or not to gather such additional information.

### C. Conclusion on the Likelihood of Success

Based upon the record, the court finds that plaintiffs have demonstrated a substantial likelihood that they will succeed in demonstrating that the FONSI issued by the FWS is arbitrary and capricious.

1) The court finds that it was arbitrary and capricious to hold that the loss of 20% of optimal habitat in the action area, on top of previous losses of 20.6% of optimal habitat in the action area since the species was listed, would have no significant impact on the species, despite the fact that the species was found to be endangered because of prior losses of habitat. Such a conclusion is at odds with the absolute, cumulative and relative losses of habitat, and is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfr. Ass'n. v. Stae Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

2) The court finds that the FONSI was arbitrary and capricious on the additional basis that the record does not explain how such a substantial cumulative loss of habitat would not have a significant impact on the ABM. Such an implausible conclusion from the facts found was not explained on the basis of agency expertise or any other fact or analysis. *Hill v. Boy*, 144 F.3d 1446 (11th Cir.1998).

3) The court further finds that the FONSI was arbitrary and capricious because the agency lacked necessary information upon which to base its finding, including: a) the minimum habitat requirements of the species and/or of a colony of the species; b) the effect of the loss of optimal habitat on the species and/or a colony of the species; c) the effect of the loss of such a substantial portion of escarpment on the terrain and thus on the species.

### D. Other Requirements for Preliminary Injunction

The court has found that, on several theories, the plaintiffs have demonstrated

agency shall always make clear that such information is lacking.
(a) If the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement.

(b) If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known, the agency shall include [certain information] within the environmental impact statement...."

a substantial likelihood that they will prevail on the merits. The court thus considers the remaining factors for issuance of a preliminary injunction.

### 1. Presumptions

[■ ] The parties disagree over the correct standard to be applied in addressing these factors in a NEPA case. With respect to the second element of the preliminary injunction standard, plaintiffs cite *Loggerhead Turtle v. County Council of Volusia*, Fla, 896 F.Supp. 1170, 1180 (M.D.Fla.1995), for the proposition that, in cases involving threatened harm to an endangered species, there is an irrebuttable presumption that the threatened harm is irreparable. Plaintiffs further assert that the balancing of harm in the third and fourth elements has been definitively determined by Congress. See *Sierra Club v. Marsh*, 816 F.2d 1376, 1383 (9th Cir.1987); *TVA v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). The Intervenors disagree, and claim that the general balancing of harm has not been displaced in suits under NEPA and the APA, as in the instant action, as opposed to suits brought pursuant to the ESA.

In *TVA v. Hill*, the Supreme Court discussed the ESA's statement of policy:

> One would be hard pressed to find a statutory provision whose terms were any plainer than those in §§ 7 of the Endangered Species Act. Its very words affirmatively command all federal agencies "to *insure* that actions *authorized, funded,* or *carried out* by them do not *jeopardize* the continued existence" of an endangered species or "*result* in the destruction or modification of habitat of such species . . . ." 16 U.S.C. §§ 1536 (1976 ed.). (Emphasis added.) This language admits of no exception.

*TVA v. Hill*, 437 U.S. at 173, 98 S.Ct. 2279. The Ninth Circuit has held that this legislative command effectively strips federal courts of discretion in determining the balance of hardships between the parties. *Sierra Club v. Marsh*, 816 F.2d at 1383 (citing *TVA v. Hill*, at 173, 98 S.Ct. 2279).

In *Amoco Production Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987), the Supreme Court held that the statute at issue therein—the Alaskan National Interest Lands Conservation Act ("ANILCA"), 16 U.S.C. § 3120—did not contain a clear Congressional statement of intent to displace the traditional equitable power of the courts, or the traditional balancing of equities. It further held that injunctive relief in an action brought under ANILCA was not governed by the legislatively mandated presumptions of the ESA, merely because the action involved environmental considerations. The action was brought to challenge sales of oil and gas leases and enjoin exploratory drilling under the leases on the basis that the actions would impact the traditional hunting and fishing rights of Alaskan natives. The Court's decision focused on the purpose and text of the statute under which suit was filed.

The court of appeals had held that irreparable damage is presumed when an agency fails to evaluate thoroughly the environmental impact of a proposed action. *Id.* at 541, 107 S.Ct. 1396. The Supreme Court reversed, holding that the presumption violated traditional equitable principles, was not supported by the text of ANILCA, and was not a necessary corollary to that Act's purposes. *Id.* at 542–43, 107 S.Ct. 1396. It held that courts must apply the usual analysis before granting equitable relief.

> "Of course, Congress may intervene and guide or control the exercise of the courts' discretion, but we do not lightly assume that Congress has intended to depart from established principles. . . . 'Unless a statute in so many words, or by necessary and inescapable inference,

restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied.'"

*Id.* at 542, 107 S.Ct. 1396 (quoting *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982), which in turn quoted *Porter v. Warner Holding Co.,* 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946)).

The Court went on to compare the situation presented to that addressed in *Romero–Barcelo.* In that case, the purpose of the Act being construed, the Federal Water Pollution Control Act, was to restore and maintain the integrity of the nation's waters; the Court had found that allowing the statutory violation to continue during the permit process would not undermine the purpose of the Act. *Romero–Barcelo,* 456 U.S. at 314–15, 102 S.Ct. 1798. The Court also noted that there were alternative means of enforcement provided by the statute, including fines and criminal penalties. *Id.* at 314.

Similarly, in the *Village of Gambell* decision, the Court held that the purpose of ANILCA, to protect subsistence resources from unnecessary destruction, would not be undermined by the district court's refusal to enter a preliminary injunction, as the agency had found (and the courts had accepted) that the exploration would not undermine this policy. *Village of Gambell,* 480 U.S. at 544, 107 S.Ct. 1396. It also found that compliance could have been obtained through the alternate means of an order declaring that ANILCA applied to the Outer Continental Shelf[53], as that issue was the basis for the agency's decision not to comply with ANILCA.

The *Village of Gambell* Court distinguished its decision in *TVA v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117

(1978). In *Hill,* the Court had held that, in passing the ESA, Congress had foreclosed traditional equity discretion.

"That statute contains a flat ban on destruction of critical habitats of endangered species, and it was conceded that completion of the dam would destroy the critical habitat of the snail darter. We stated:

Refusal to enjoin the action would have ignored the 'explicit provisions of the Endangered Species Act.' ... The purpose and language of the statute [not the bare fact of a statutory violation] limited the remedies available to the District Court; only an injunction could vindicate the objectives of the Act."

*Village of Gambell,* 480 U.S. at 543 n. 9, 107 S.Ct. 1396 (internal citations omitted)(quoting *Romero–Barcelo, supra,* in turn quoting *TVA v. Hill, supra.*)

In *Village of Gambell,* the Court addressed NEPA in passing, noting that the agency had complied with its terms and had prepared a 332–page EIS which addressed all effects the proposed sale and subsequent development "could conceivably have on 'subsistence uses'...." *Id,* at 538, n. 5, 107 S.Ct. 1396. The Court noted the lower court's failure to challenge the agency's findings that significant disturbance or reductions in primary resources "utilized for subsistence was unlikely for the region as a whole." *Id.* However, the Court did not address the effect of their holding on suits brought under NEPA.

Unlike the statutes at issue in *Village of Gambell, Romero–Barcelo,* and *TVA v. Hill,* NEPA does not contain a substantive component; it requires only that its procedures be followed, and not that any partic-

---

**53.** However, as the Court thereafter held, ANILCA does not apply to the Outer Continental Shelf. *Id.* at 546, 107 S.Ct. 1396.

ular result be reached. See *Robertson*, 490 U.S. at 350–51, 109 S.Ct. 1835. As noted above, not all NEPA challenges necessarily involve endangered species. NEPA requires full consideration of environmental impacts before a final decision on a major federal project. That purpose is undermined when a decision is made on an action which threatens significant environmental harm without consideration of all relevant facts, preparation of an EIS, and consultation with other agencies.

Plaintiffs have brought suit under NEPA in part because they cannot address the alleged violation of the ESA prior to giving the agency sixty days notice. Nonetheless, it is NEPA's purpose the court must consider under the above-cited cases. The court finds that NEPA's purposes would be undermined by issuance of the ITPs without preparation of an EIS, if one is ultimately found to have been required; however, those purposes are not necessarily violated by the destruction of the habitat at issue. Thus, though an injunction may be warranted under the facts of this case upon a balancing of the equities, the text and purpose of NEPA do not indicate a Congressional intent to displace those traditional equitable principals.

■■■ The court, however, notes that this case involves an endangered species and permanent destruction of its optimal habitat.[54] As stated by the Court in *Village of Gambell,*

> the environment can be fully protected without this presumption.

> Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issu-

ance of an injunction to protect the environment. . . .

*Id.* at 545, 107 S.Ct. 1396 (quoting opinion below, *People of Village of Gambell v. Hodel,* 774 F.2d 1414, 1430 (9th Cir.1985)).

The court notes that this ruling may lead to unwanted results in some cases in which harm is threatened to an endangered species. NEPA is sometimes used as an alternative to suit under the ESA where agency action threatens immediate harm to an endangered species, but the threat is so imminent that suit under the ESA would be precluded by the mandatory 60–day notice of suit, delaying any possible remedy until after the damage or some substantial part thereof had been accomplished. In such a case, if the court were to deny temporary injunctive relief on the basis that plaintiff had not demonstrated irreparable harm and/or that the traditional balancing of equities did not mandate entry of the injunction, that same court would then be required to revisit that determination after the 60–day period had ended and the plaintiff had amended the complaint to include its claim under the ESA. At that stage, the Congressional commandment of the ESA could affect the court's balancing regardless of the developers' progress, see *TVA v. Hill, supra,* and could require overruling the denial of injunctive relief—*after* 60 days of damage had been done, *after* the public or private parties seeking such decision had invested more effort and funds in reliance on the ITP, and *potentially after* the extinction of the endangered species had been assured. Denial of injunctive relief in such a case would violate Congress' intention in enacting the ESA to ignore the stated policy of protecting endangered species regardless of the cost.

---

54. As less than an acre of the ABM's critical habitat—as it is currently defined—will be directly impacted, the court does not consider this loss of critical habitat in addressing this issue.

That difficult situation is not before the court. In this case, the court need not rely upon the Congressional pre-balancing of equities as found in the ESA to find issuance of a preliminary injunction to be proper. The traditional balancing of equities leads to the same determination. As the Supreme Court indicated in *Village of Gambell* and *Romero–Barcelo,* statutory goals are important in addressing the equitable factors.

### 2. Substantial Threat of Irreparable Injury

The threatened harm, destruction of optimal habitat of an endangered species, is clearly irreparable. The portions of the dune ecosystem on which construction is begun will no longer be available to support the local ABM population. That loss of habitat will have an effect on the beach mouse population, including loss of individual members of the species, destruction of nests or burrows, loss of food sources, and destruction of the dunes, escarpment and other physical components of the dune ecosystem. Under the facts of this case, it appear those effects may be as serious as local extirpation of the colony or even loss of long-term viability of the species.

Further, because NEPA addresses the agency's procedures prior to issuance of the permits, the court finds that the failure to prepare an EIS before issuing the ITPs at issue constitutes irreparable injury. As the then-Judge Breyer held in *Massachusetts v. Watt,* 716 F.2d 946 (1st Cir.1983)(Breyer, J.) and *Sierra Club v. Marsh,* 872 F.2d 497 (1st Cir.1989)(Breyer, J.), an agency's failure to comply with NEPA before reaching a determination can constitute irreparable injury. In *Massachusetts v. Watt,* plaintiffs sought an injunction against an oil lease sale by the Department of the Interior. The government argued that allowing the sale would cause no irreparable injury because leases do not directly harm the environment and there were many steps remaining prior to exploration. The court held that, when the decision was made without preparation of an EIS, "the harm that NEPA intends to prevent has been suffered." *Id.* at 952. "[A] new EIS [ ] may bring about a new decision, but it is that much less likely to bring about a different one. It is far easier to influence an initial choice than to change a mind already made up." *Id.*

In *Sierra Club v. Marsh, supra,* Judge Breyer clarified that "irreparable environmental injury" meant physical environmental harm which could not later be repaired. 872 F.2d at 499. The court explained that a harm that results from not following procedure can be an environmental harm.

> We did not(and would not) characterize the harm described as a 'procedural' harm, as if it were a harm to procedure.... Rather, the harm at stake is a harm to the environment, but the harm consists of the added risk to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis ... of the likely effects of their decision upon the environment.

*Id.* at 500–01 (citations omitted).

District courts within this Circuit has adopted this approach, as well as addresses environmental effects such as habitat losses. See *Save Our Dunes v. Pegues,* 642 F.Supp. 393, 407 (M.D.Ala.1985).

Finally, the court notes that an injunction of construction in reliance on the ITPs is necessary to defend this court's ability to enter meaningful and effective relief in this action. The developers have already argued that their voluntary pre-permit expenditures have created too great a harm to allow the court to enjoin their projects. Additional construction and the destruction of the very habitat this action was

brought to protect, would potentially preclude or limit the court's ability to craft a meaningful remedy. Failure to enjoin the construction would seriously diminish plaintiff's opportunity to obtain relief in this case.

### 3. Balance of Harms

[■] The court further finds that plaintiffs have demonstrated that the threatened injury to the plaintiff outweighs the harm an injunction may cause the defendants and the intervenors. The court here considers enjoining reliance on the two ITPs previously issued by the FWS pending a final determination in this action. The court may ultimately remand the ITPs for further consideration including preparation of an EIS, but that remedy is not presently available on the instant Motion for Preliminary Injunction.

The proposed injunction threatens little tangible harm to the governmental entities named as defendants in this action. The relevant harm is that which may be suffered by the intervenors, who have relied on the permits to their detriment.

Intervenors expended a great deal of money purchasing the property at issue, preparing the ITP applications, and otherwise planning for construction of their developments in the event that the FWS granted their applications. Those are "sunk" costs; the money was spent prior to the decision challenged, and are not directly affected by the agency's challenged action or by the court's order. However, the entry of the injunction will delay the defendant's opportunity to recoup those expenditures. While defendants had no legitimate expectation that the ITPs would be issued at a particular time, and no legitimate interest in the issuance of the ITPs in violation of NEPA, the delay of repayment is nonetheless a factor to be balanced by the court. The delay of construction of the projects will also have other adverse effects on the Intervenors.

At the hearing, Intervenors offered evidence that a preliminary injunction will cause an incremental daily loss to the developers of approximately $30,000 per day. Intervenors did not offer evidence concerning the elements of this figure; however, plaintiffs do not challenge this estimate. The court presumes that this daily loss figure includes all losses due to the delay of construction, including the delay of the return on defendant's investment. However, while the record indicates that Intervenors' position if an injunction is issued will not be significantly changed from what their position would have been if the FWS had not prematurely issued the ITPs.

Further, the injunction will mitigate some of the potential harm to the intervenors in the substantially likely event that the court ultimately finds in favor the plaintiffs on the merits of their claims. It would do the Intervenors little good if they were allowed to continue construction under permits later found to be invalid. They cannot continue to "take" the beach mice without a permit, and thus cannot continue with most of their construction during the remand. If ultimately the permits are not re-issued, defendant's construction efforts and expenditures would have been wasted.

The developers were allowed to begin limited initial construction during the pendency of this motion for preliminary injunction on the basis of their undertaking that they temporarily would not begin construction in areas in which trapping data suggested that the ABM were present. If the injunction is not issued, however, Intervenors will be free to begin construction of the remaining portions of the project area; in any event, their temporary undertaking to avoid such activities will expire

shortly thereafter. The court has already indicated that plaintiffs have a substantial likelihood of prevailing on their argument that the destruction of the habitat at issue will have a significant impact on the endangered Alabama beach mouse, including negative impacts on its ability to survive and recover. The court finds that, in light of the seriousness and likelihood of the threatened harm to the species and its habitat, those considerations outweigh the economic harm which will be suffered by the Intervenors pending a final ruling in this case. See *Save Our Dunes*, at 407.

*4. Public Interest*

Plaintiffs have also demonstrated that granting the injunction would not disserve the public interest. Intervenors argue that an injunction will delay the construction jobs as well as the use of the condominiums they intend to construct. Presuming, without deciding, that the effects on individual third parties (as opposed to the public in general) are cognizable under this prong, the court nonetheless finds that, on balance, the public's interest will be better served by entry of the preliminary injunction.

The injunction will prevent irreparable damage to the dune ecosystem and to the beach mouse pending a final determination of the propriety of the ITPs at issue; the public interest, as identified by Congress in passing NEPA and the ESA, favors informed agency decision-making and the protection of endangered species.

## VI. *Conclusion*

For the foregoing reasons, the court finds that a preliminary injunction is proper in this action. Accordingly, it is hereby **ORDERED** that plaintiffs' Motion for Preliminary Injunction is **GRANTED.** A preliminary injunction shall separately issue.

The Clerk is directed to refer this matter to the Magistrate Judge assigned to this case to conduct a scheduling conference. The court will thereafter set this action for trial on the merits.